John G. Balestriere*
Jillian L. McNeil**
Email: john.balestriere@balestriere.net
**BALESTRIERE FARIELLO**
225 Broadway, Suite 2900
New York, NY 10007
Telephone: (212) 374-5401
Facsimile: (212) 208-2613
*Attorneys for Plaintiff/Relator*
*Admitted Pro Hac Vice*
***Passed July 2011 New York Bar Exam,*
*Awaiting Admission to New York Courts*

David J. Miclean
Email: dmiclean@micleangleason.com
**MICLEAN GLEASON LLP**
100 Marine Parkway, Suite 310
Redwood Shores, CA 94065
Telephone: (650) 684-1181
Facsimile: (650) 684-1182
*Attorneys for Plaintiff/Relator*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*, JOHN C. PRATHER, *et al.* <br><br> Plaintiff-Relator, <br><br> v. <br><br> AT&T INC., CELLCO PARTNERSHIP d/b/a VERIZON COMMUNICATIONS, QWEST COMMUNICATIONS INTERNATIONAL, INC., SPRINT NEXTEL CORP., AND TELEPHONE AND DATA SYSTEMS, INC. <br><br> Defendants. | Case No.: C 09-02457 CRB <br><br> **PLAINTIFF-RELATOR'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS COMPLAINT** <br><br> Date: April 20, 2012 <br> Time: 10:00 am <br> Judge: Hon. Charles R. Breyer <br> Courtroom: 6, 17th Floor |

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ................................................................................ 1

II. STATEMENT OF FACTS ................................................................................ 8

III. APPLICABLE LEGAL STANDARDS ................................................................ 9

    A. False Claims Act Standards ...................................................................... 9

    B. Motion to Dismiss Standard ..................................................................... 10

IV. ARGUMENT ................................................................................................... 11

    A. The Court Has Subject Matter Jurisdiction Over Relator's Federal, State, and Local False Claims Causes of Action Because Relator Is the Original Source of the Information ...................................................................... 11

        1. Relator Has Direct and Independent Knowledge of Defendants' False Claims............................................................................... 12

            a. Relator Does Not Base His Allegations on Information Provided in the FCC Proceedings, nor the DOJ Report .......... 14

            b. Relator Need Not Be an Employee of One of the Telecoms to Have Direct and Independent Knowledge ............................... 15

            c. The Nextel and Verizon Letters Do Not Encompass the Scope of Relator's Direct Knowledge, But Simply Corroborate Relator's Independent, Personal Knowledge of Defendants' False Claims .................................................................... 16

        2. Relator Voluntarily Provided This Information to the Government Before Filing This Action........................................................ 18

        3. The Information Relayed by Relator Led to the Disclosure of the Telecoms' False Claims Practices in the Initial FCC Investigation and DOJ Report ...................................................................... 19

    B. Relator Adequately Pleads the Elements of the Federal FCA Claim ............ 21

        1. Relator Pleads Sufficient Facts to Demonstrate that Defendants Knowingly Presented False or Fraudulent Claims for Payment to the Federal Government.................................................................... 21

        2. Relator Adequately Pleads Scienter, Which May Be Pleaded Generally ............................................................................... 23

    C. Relator Pleads the FCA Claims with Particularity, Satisfying Rule 9(b) ...... 25

    D. Relator Makes Sufficient, Particularized Allegations Regarding the False Claims of AT&T and Qwest, Such That Relator's Claims against All Defendants Are Adequately Pleaded ...................................................... 27

E.  Because Relator's State and Local FCA Claims Are Substantially Similar to Relator's Federal FCA Claim, the State and Local Claims Should Also Survive Dismissal ............................................................................................... 28

F.  Deficiencies—If Any—in Relator's Complaint Can Be Cured Through Amendment ................................................................................................... 29

V. CONCLUSION............................................................................................................. 30

PLAINTIFF-RELATOR'S OPPOSITION TO DEFS' MOTS. FOR DISMISSAL
Case No:  C 09-02457 CRB

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**Federal Cases**

4

*Ashcroft v. Iqbal*,
5
   556 U.S. 662 (2009) ................................................................. 10

6
*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................. 10

7
*Eminence Capital, LLC v. Aspeon, Inc.*,
8
   316 F.3d 1048 (9th Cir. 2003) ................................................. 29

9
*Foman v. Davis*,
   371 U.S. 178 (1962) ........................................................... 29, 30

10
*Griggs v. Pace Am. Group, Inc.*,
11
   170 F.3d 877 (9th Cir. 1999) ................................................... 29

12
*Houck ex rel. U.S. v. Folding Carton Admin.*,
   881 F.2d 494 (7th Cir. 1989) ................................................... 15

13
*In re Nuveen Funds/City of Alameda Securities Litigation*,
14
   2011 WL 1842819 (N.D. Cal. 2011) ....................................... 28

15
*Moss v. U.S. Secret Service*,
   572 F.3d 962 (9th Cir. 2009) ................................................... 29

16
*Neubronner v. Milken*,
17
   6 F.3d 666 (9th Cir. 1993) ....................................................... 25

18
*Serrote v. Marin County*,
   2011 WL 2039079 (N.D. Cal. 2011) ....................................... 11

19
*Strom ex rel. U.S. v. Scios, Inc.*,
20
   676 F.Supp.2d 884 (N.D. Cal. 2009) ........................... 22, 24, 25

21
*Swartz v. KPMG, LLP*,
   476 F.3d 756 (9th Cir. 2007) ................................................... 27

22
*U.S. ex rel. Aflatooni v. Kitsap Physicians Services*,
23
   163 F.3d 516 (9th Cir. 1999) ................................................... 10

24
*U.S. ex rel. Devlin v. California*,
   84 F.3d 358 (9th Cir. 1999) ........................... 11, 16, 17, 18

25
*U.S. ex rel. Dick v. Long Island Lighting Co.*,
26
   912 F.2d 13 (2d Cir. 1990) ...................................................... 20

27
*U.S. ex rel. Feldstein v. Organon, Inc.*,
   2009 WL 961267 (D.N.J. April 7, 2009) ................................. 17

28

iii

*U.S. ex rel. Friedland v. Environmental Chemical Corporation*,
   2003 WL 23315783 (N.D. Cal. 2003) ................................................................ 25, 28

*U.S. ex rel. Gale v. Raytheon Company*,
   2009 WL 3378976 (S.D. Cal. 2009) ............................................................ 10

*U.S. ex rel. Green v. Northrup Corp.*,
   59 F.3d 953 (9th Cir. 1995) .................................................................. 3

*U.S. ex rel. Grubbs v. Kanneganti*,
   565 F.3d 180 (5th Cir. 2009) ............................................................. 25

*U.S. ex rel. Hansen v. Cargill, Inc.*,
   107 F.Supp.2d 1172 (N.D. Cal. 2000) ....................................................... 10, 12, 19

*U.S. ex rel. Hendow v. University of Phoenix*,
   461 F.3d 1166 (C.D. Cal. 2006) ......................................................... 22, 30

*U.S. ex rel. Hopper v. Anton*,
   91 F.3d 1261 (9th Cir. 1996) ............................................................ 22, 30

*U.S. ex rel. Lee v. SmithKline Beecham, Inc.*,
   245 F.3d 1048 (9th Cir. 2001) .......................................................... 25, 26

*U.S. ex rel. Rosales v. San Francisco Housing Authority*,
   173 F.Supp.2d 987 (N.D. Cal 2001) ........................................................ 21

*U.S. ex rel. Williams v. NEC Corp.*,
   931 F.2d 1493 (11th Cir. 1991) .......................................................... 18

*Wang v. FMC Corp.*,
   975 F.2d 1412 (9th Cir. 1992) ........................................................ passim

**Statutes & Rules**

18 U.S.C. § 2518(4) ...................................................................... 5

28 C.F.R. § 100.12 .................................................................... 5, 21, 22

31 U.S.C. § 3729 ..................................................................... 9, 21, 23

31 U.S.C. § 3730 .................................................................. passim

Cal. Gov. Code § 12652 ............................................................... 6, 12, 28

D.C. Code § 2-381.03 ..................................................................... 28

Federal Rule of Civil Procedure 15 ...................................................... 29

N.H. Rev. Stat. § 167:61-b ............................................................... 28

Nev. Rev. Stat. §  357.100 ............................................................... 28

New York City Local Law 53 of 2005, § 7-804 ............................................. 6

iv

**PRELIMINARY STATEMENT**

Defendant telecommunication carriers AT&T, Inc. ("AT&T"), Cellco Partnership d/b/a Verizon Communications ("Verizon"), Qwest Communications International, Inc. ("Qwest"), and Sprint Nextel Corp. (collectively "the Telecoms" or "Defendants") never deny that they exploited the passage of the Communications Assistance to Law Enforcement Agencies Act ("CALEA") to overcharge the Nation's prosecutors for years. Instead, in their motion to dismiss ("the Motion"), Defendants claim, in vain, that there was a public disclosure of their false claims, warranting dismissal. Defendants go even further in an attempt to mislead the Court in two ways. First, while focusing greatly on a 2004 administrative proceeding commenced by the Federal Communications Commission ("the FCC") intended to address the scope of CALEA in light of several technological advances ("the FCC Proceedings"), and where Defendants say there was a public disclosure, Defendants *never* note that it was relator John C. Prather ("Prather" or "Relator") alone, who made the disclosure. And, second, Defendants wrongly assert that the FCC Proceedings were about cost concerns. This is an outright lie. The FCC Proceedings had nothing to do with costs. Prather merely took advantage of the opportunity provided by the FCC Proceedings to attempt to gain government interest in his concerns about the Telecoms' overcharges. Prather voluntarily disclosed his allegations and was the only individual who did so.

<u>**Prather Is the Original Source of the Allegations**</u>

It is indisputable that Prather is the original, primary, and indeed, likely the only source of the allegations that the Telecoms have overcharged state and federal Governments for eavesdropping for many years. First and foremost, Prather is uniquely situated—given the range and length of his experience—to be the relator that has revealed the Telecoms' false claims. Prather is a lifelong prosecutor who several years ago tried to pique Government interest in Defendants' practice of overcharging before he was forced to initiate this false claims action. After CALEA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

was implemented in 1994, Prather's unique position allowed him to see that the Telecoms' monthly eavesdropping charges increased by approximately *ten fold* from what the charges were prior to the passage of CALEA.  Prather references individuals that he spoke to about his own knowledge of Defendants' false claims, and provides the Court with correspondence to support his assertions.  But the simple fact is that his uncommon experience—as both a line prosecutor, and as a manager of one of the Nation's best staffed organized crime prosecution offices, who brought organized crime prosecutions in both federal and state courts, for more than 15 years before CALEA, and for more than 15 years after CALEA—makes him uniquely suited to be the original source of the allegations he adequately pleads in the complaint, Docket Entry 1 ("the Complaint").

Second, given that Prather is the original source, any public disclosure is a non-issue for false claims pleadings purposes.  Relator's claims are in no way "*based upon the public disclosure of allegations*" made in the FCC Proceedings.  31 U.S.C. § 3730(e)(4)(A).  *See, e.g.* Complaint ¶¶ 60, 68-71.  The pleadings demonstrate that any disclosure was made by Prather, and by Prather alone.  In the 2004 FCC Proceedings, Prather went out of his way to point out the overcharges at the heart of the Complaint.  *See* Declaration of Jonathan H. Blavin in Support of Defendants' Joint Motion to Dismiss Complaint, Docket Entry 63-1, ("Blavin Declaration"), Ex. 4 ("First Prather Affidavit") and Ex. 7 ("Second Prather Affidavit").  The FCC Proceedings frankly had nothing to do with the Telecoms' practice of overcharging the Governments, and Prather was certainly under no obligation to raise that issue there, or in any other context.  The FCC Proceedings were, instead, initiated to evaluate proposed amendments to CALEA and rules for its better implementation. The FCC Proceedings, on which Defendants so heavily rely, make clear that any alleged "public disclosure" of Prather's allegations was in fact based solely on Prather's own information.  *See* Blavin Declaration, Ex. 4 at 22 ("[a]s fully set forth *in the Affidavit of J.*

*Christopher Prather*, the fees many carriers charge the NY [Office of the Attorney General] are related neither to expenses incurred provisioning a wiretap nor [are] reasonable") (emphasis added).  Prior to Prather's involvement, there was no publicly disclosed suspicion that the Telecoms were overcharging the Governments, as it turns out they were.  Later, it was *Prather*, and Prather alone, who made it clear that Defendants were making false claims to the Governments.

Nearly two years later, in March 2006, the DOJ Office of the Inspector General issued an audit report entitled "Implementation of the Communications Assistance for Law Enforcement Act" (the "DOJ Report").  Like the 2004 FCC Proceedings, the DOJ Report primarily focused on the logistical implementation of CALEA and proposed changes to its structure.  The DOJ Report does, briefly, point out that a law enforcement official "noted that '[w]ith CALEA, the carriers do less work but it costs approximately 10 times as much to do a CALEA-compliant tap versus a traditional tap" (Complaint, Exhibit E at 11)—but that law enforcement official, again, was Prather.

Failing to attract regulatory interest in his concerns, Prather did exactly what the framers of the Federal False Claims Act ("the FCA") and state false claims acts ("state FCAs") intended: he disclosed his information to attorneys for the Governments and filed the Complaint.  To grant Defendants' Motion would create an unjust rule providing that a relator that points out fraud to the Government cannot later bring a false claim if the Government does not adequately respond to his initial concerns.  Such a rule would subvert the incentives which the FCA was enacted to provide.  *See, e.g., U.S. ex rel. Green v. Northrup Corp.*, 59 F.3d 953, 963 (9th Cir. 1995) ("the central purpose of the False Claims Act [is] 'encourag[ing] insiders privy to a fraud on the government to blow the whistle on the crime").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### After Nearly Four Decades as a Prosecutor, Prather Possesses Independent and Direct Knowledge

As a career prosecutor who has been in government service for almost forty years, Prather has extensive knowledge of the costs associated with eavesdropping, both before and after the implementation of CALEA.  After serving as an Assistant Attorney General in North Carolina, an Assistant District Attorney in the New York County (Manhattan) District Attorney's Office, a Deputy Inspector General at the New York City School Construction Authority, and as an Assistant Attorney General in the New York State Attorney General's Office, Republican Governor George Pataki and Democratic Attorney General Eliot Spitzer jointly appointed Relator the Deputy Attorney General in charge of the New York Statewide Organized Crime Task Force ("OCTF").  This long and diverse experience makes Prather a unique and ideal relator, and makes plain that Prather needed only to rely on his own experience and knowledge to assert the false claims pleaded in the Complaint.

Relator pleads that his knowledge of the Telecoms' fraud is both *independent* and *direct*.  Relator's knowledge is independent, first, because it does not rely on any public disclosure, and, second, because he gained all of his information as the result of his *own experience and relationships* made while working in multiple prosecutors' offices, for years, both before and after the enactment of CALEA.  Relator's knowledge of the Telecoms' fraud is direct because he obtained it firsthand through his own efforts.

As detailed in his Complaint, and which Relator voluntarily gave to the Governments in 2008, as well as earlier in the 2004 FCC Proceedings, Relator brings this *qui tam* action to recover monies paid by the Federal Bureau of Investigations ("FBI"), and State Law Enforcement Agencies (collectively "the Law Enforcement Agencies"), and the Department of Justice ("DOJ" or "the Government"), on the basis of false claims submitted by Defendants to the federal government under the FCA, 31 U.S.C. § 3729 et seq., the thirteen states of California, Delaware, Florida, Illinois,

Massachusetts, New Hampshire, New Jersey, New Mexico, New York, Nevada, Rhode Island, Virginia, as well as the District of Columbia (collectively "the States") under the States' individual false claims acts, and the cities of New York and Chicago under their local false claims acts (the Government and the States, collectively "the Governments").

### Telecoms Defraud American Investigators out of Millions

The facts are straightforward: for over a decade, the Nation's Telecoms have defrauded America's prosecutors out of perhaps tens of millions of dollars. Defendants never deny this in the Motion. The prices that the Telecoms charge to the Governments are enormously more than Defendants would charge a reasonable businessperson for the exact same equipment or data service in direct violation of law, as seen by reference to the Code of Federal Regulations, 28 C.F.R. § 100.12, and the Omnibus Crime Control and Safe Streets Act of 1968 ("OCCSSA"), 18 U.S.C. § 2518(4). Those statutes require that the Telecoms only bill the Governments for eavesdropping expenses that are "reasonable." Although private individuals obviously are not in the business of legal eavesdropping, the services involved are very similar to general telecommunications goods and services which the Defendants provide, at a fraction of the price, in a competitive market, to private citizens and companies. Indeed, Prather knows and pleads that, prior to CALEA, eavesdropping charges approximated that of the provision of an equivalent phone line. The Telecoms exploited the change after CALEA to overcharge massively for eavesdropping.

### The Verizon and Nextel Letters Simply Corroborate Prather's Independent and Direct Knowledge

The letters from two Telecoms ("the Verizon and Nextel Letters"), attached to the Complaint, are hardly the only evidence that Relator has of the Telecoms' overcharging, and Relator never claims that they are. Having nothing else to argue, Defendants focus on the two letters to assert that Relator, according to them, is only

relying on secondary sources for his information.  However, these letters serve merely to corroborate Prather's independent knowledge.  In fact, in the pleadings, Relator specifically asserts that his direct knowledge is from his personal work experience. The Nextel letter even represents an outright admission of fraud—Nextel acknowledges that the prices for eavesdropping *are* inflated, but provides a legally impermissible justification.  Nextel claims the unjustifiably high price is due to amortization of software and hardware upgrades, but the expenses for such items were supposed to be paid for by funds provided by CALEA, *not* amortized in inflated eavesdropping costs.  While the Verizon and Nextel Letters represent evidence, and even an admission, of Defendants' fraud, they do not constitute the extent of Prather's direct and independent knowledge of the false claims – they merely support this knowledge.

**Prather Complies with All Requirements of State and Local False Claims Statutes**

Relator also meets any additional obligations imposed by the State FCAs. Some jurisdictions require that, to be considered an original source, a relator's information must have formed the basis of the public disclosure.  *See, e.g.*, Cal. Gov. Code § 12652(d)(3)(B) (2010).   This is precisely what happened in the FCC Proceedings.  As noted, the FCC Proceedings were held simply to address issues with the CALEA statute, and propose rules for better implementing the new law.  And the DOJ Report's only reference to any issues of costs is to quote the affidavit which Prather himself submitted as part of the FCC Proceedings.  Moreover, as a prosecutor who made his career focused on investigating organized crime in and around New York City, Prather easily complies with the New York City False Claims Statute that he be the "primary source" of the allegations.  New York City Local Law 53 of 2005, § 7-804(d)(3).

1

2

### **Relator Adequately Asserts the False Claims Under the Federal Pleading Rules Against All Defendants, Including AT&T and Qwest**

Finally, Relator alleges sufficient facts to surpass the pleading standards under the Federal Rules of Civil Procedure 12(b)(6) and 9(b).  ("Rule 12(b)(6)" and "Rule 9(b)" respectively).  In his pleadings, Relator lays out the elements of the False Claims Act claims (Complaint ¶¶ 56-58), gives notice to the Telecoms of those claims (Complaint ¶¶ 72-78), and provides sufficient facts to demonstrate the plausibility of his claims (Complaint ¶¶ 33-71).  Relator pleads that the bills were inflated given the services needed and requested, and that the overcharging resulted—and continues to result—in false claims to the Governments.  In other words, Relator, in more than sufficient detail at the pleadings stage, alleges that the Telecoms misrepresent the cost of providing eavesdropping services in their bills to the Governments.  This is a false claim.

Likewise, Relator meets the Rule 9(b) standard in his Complaint by alleging the who, what, where, when, and how of Defendants' fraud for all of the Telecoms. AT&T and Qwest are incorrect in claiming that Relator does not adequately name them in his discussion of the Telecoms' fraud.  At the opening of the Complaint, both providers are included in the definition of "Telecoms," and, as such, are named throughout the pleading.  While the letters attached to the pleading may name only Verizon and Nextel, as discussed above, these are merely examples of fraudulent statements made by the Telecoms, and, in the case of Nextel, an admission.  Prather makes clear that all the Telecoms perpetrated the same overcharging false claim, and discovery will yield additional documentation, including information from AT&T and Qwest, to support Relator's allegations.  Because the Complaint provides sufficient notice to the Defendants of the claims against them, and demonstrates plausibility that the facts presented support those claims, the Telecoms' Motion to Dismiss should be denied.[1]

---

[1] Relator filed a Rule 41 notice of dismissal regarding Defendant Telephone and Data

**STATEMENT OF FACTS**

Defendants have massively overcharged the Law Enforcement Agencies for the costs involved in "wiretapping"—the electronic capturing of phone conversations to which law enforcement is not a party—and similar electronic capturing of illicit communications information (collectively "eavesdropping" or "electronic surveillance"). Complaint ¶ 44; Complaint ¶ 57. Defendants' deliberate overcharging gravely impacts the Law Enforcement Agencies' ability to fund and conduct the types of criminal investigations that are tremendously aided by electronic surveillance. Complaint ¶ 41; Complaint ¶ 46.

In 1994, Congress enacted the Communications Assistance to Law Enforcement Agencies Act ("CALEA"), to provide the Telecoms with $500 million so that they could, at public expense, update the eavesdropping capabilities of the Nation's Law Enforcement Agencies, paying for both hardware and software. Complaint, Exhibit E at 1. The Telecoms have, in turn, responded to CALEA, intended to make eavesdropping more accessible to the Governments, by engaging in a massive overcharging fraud. They are able to do this for two reasons: first, the eavesdropping budget of the Governments are not generally scrutinized by the media, public, or any legislature; and, second, the average citizen or even legislator does not understand the mechanics of eavesdropping sufficiently to question the charges the way an individual prosecutor, such as the Relator here, has been able to after knowing what eavesdropping once cost, and then seeing, post-CALEA, outrageously high and unjustified invoices. Complaint ¶ 20; Complaint ¶ 71.

Moreover, Relator voluntarily gave the information he gathered to the Governments before filing this action. Despite Defendants' wishes to the contrary, the affidavits that he submitted to the FCC in 2004 simply were not made as part of Relator's job responsibilities, nor were they even called for or requested in the FCC

System, Inc. ("TDS") on February 21, 2012.

Proceedings themselves.  The FCC was not interested in investigating the fraud perpetrated by the Telecoms, and never requested any information in relation to their billing procedures.  *See* Declaration of John G. Balestriere in Opposition to Defendants' Motions to Dismiss Complaint, Docket Entry 72-1, ("Balestriere Declaration"), Ex. A ("the 2012 Affidavit") ¶ 9.  But Relator, as a result of his unique position, believed that the Telecoms' overcharging needed to be addressed, and sought to call the Governments' attention to Defendants' practices through his affidavits.  2012 Affidavit ¶¶ 3-10.  Relator voluntarily submitted his earlier affidavits to the FCC in an attempt to draw attention to the misdeeds of Defendants.  2012 Affidavit ¶ 10.  Further, although Relator gained his knowledge of Defendants' fraud through his experience as a prosecutor, and as the former Deputy Attorney General in charge of OCTF, his position in no way involved monitoring or investigating the practices of the Governments' service providers.  2012 Affidavit ¶ 1-3.  In what is a great, if somewhat reprehensible, irony, the Telecoms were supposed to be *partners* in assisting Prather and his staff conduct organized crime investigations, not *targets* of those investigations.  Relator was, instead, uniquely positioned to gain this information independently, since his position as a high-level prosecutor, with extensive experience both pre- and post-CALEA, afforded him direct access to the Telecoms' bills for providing the eavesdropping services.

**APPLICABLE LEGAL STANDARDS**

**A.  False Claims Act Standards**

Relator pleads all elements of his Federal and State FCA claims in the Complaint.  A party is liable under the Federal False Claims Act if it "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a).  The term "knowingly" requires no proof of specific intent to defraud, but merely a showing that the party, "with respect to the information . . . has actual knowledge of the information [or] acts in deliberate

ignorance of the truth or falsity of the information." 31 U.S.C. § 3729(b). While Congress enacted the FCA to "enhance the Government's ability to recover losses sustained as a result of fraud against the Government," *U.S. ex rel. Aflatooni v. Kitsap Physicians Services*, 163 F.3d 516, 521 (9th Cir. 1999), it limits a court's jurisdiction over such claims by including a bar against public disclosure. *U.S. ex rel. Hansen v. Cargill, Inc.*, 107 F.Supp.2d 1172, 1176 (N.D. Cal. 2000). As a result, a court must first determine whether there has been "a public disclosure of allegations or transactions in a criminal, civil, or administrative hearing." 31 U.S.C. § 3730(e)(4)(A). If the court determines that there has been a "public disclosure," the relator must then demonstrate that he was the "original source of the [publicly disclosed] information." Id. The state FCAs, enacted after, closely parallel the Federal FCA. *See, e.g.*, Cal. Gov. Code § 12652(d)(3)(B) (2010). As Relator's position never involved exposing the fraud of the Telecoms, who were supposed to be the Law Enforcement Agencies' partners in investigating crime, he qualifies as an original source and meets his pleading requirements under the Federal, State, and Local False Claims Acts, warranting denial of the Motion.

**B. Motion to Dismiss Standard**

Relator's pleading surpasses the applicable standards and survives Defendants' Motion to Dismiss. In a pleading, a party must provide "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the [opposing party] fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A claim must be plausible on its face to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009). The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* In considering a motion to dismiss, the court should "accept[] all factual allegations [in the complaint] as true, and draw[] all reasonable inferences in favor of the nonmoving party." *U.S. ex rel. Gale v. Raytheon Company*, 2009 WL

3378976 (S.D. Cal. 2009) (internal quotations and citations omitted).  In considering a motion to dismiss, "the question presented is not whether the plaintiff will prevail in the action, but whether the plaintiff is entitled to offer evidence in support of the claim."  *Serrote v. Marin County*, 2011 WL 2039079 at *1 (N.D. Cal. 2011).  Under this generous standard, Relator has alleged sufficient facts to adequately plead his claim, precluding dismissal.

**ARGUMENT**

**A. The Court Has Subject Matter Jurisdiction Over Relator's Federal, State, and Local False Claims Causes of Action Because Relator Is the Original Source of the Information**

This Court has subject matter jurisdiction over Relator's claims because Relator was the original source of the information regarding the Telecoms' fraud, and because Relator's claims were never based upon any "public disclosure."  The FCA's public disclosure bar provides that:

> No court shall have jurisdiction over an action under this section *based upon* the public disclosure of allegations or transactions in a criminal, civil or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is *an original source of the information*.

31 U.S.C. § 3730(e)(4)(A)[2] (emphasis added).  These requirements were "intended to bar parasitic suits through which a plaintiff seeks a reward even though he has contributed nothing significant to the exposure of the fraud," while still promoting the ultimate goal of the FCA: "ferreting out fraud by encouraging persons with firsthand knowledge of alleged wrongdoing to come forward."  *U.S. ex rel. Devlin v. California*, 84 F.3d 358, 362 (9th Cir. 1999).  After working for the very Law Enforcement Agencies most affected by Defendants' fraud for almost four decades, Relator has the requisite firsthand direct and independent knowledge for his Complaint to survive the FCA's public disclosure bar.

---

[2] All but one of the State and Local FCAs have public disclosure bars which are virtually identical to the Federal FCA.  *See* Complaint Ex. A.

Relator adequately pleads that he is the original source of the information allegedly disclosed in the FCC Proceedings and DOJ Report. To qualify as an original source under the FCA's public disclosure bar, an individual must have "direct and independent knowledge of the information on which the allegations are based," and must have "voluntarily provided the information to the Government before filing an action . . . based on the information." 31 U.S.C. § 3730(e)(4)(B). Many jurisdictions also require that the original source's voluntary disclosure "provided the basis or catalyst for the investigation, hearing, audit or report that led to the public disclosure." Cal. Gov. Code § 12652(d)(3)(B) (2010). Throughout the Complaint, Relator alleges sufficient facts demonstrating that he satisfies every element of the FCAs' "original source test," precluding dismissal.

**1. Relator Has Direct and Independent Knowledge of Defendants' False Claims**

Relator's knowledge of Defendants' false claims is both direct and independent because he gained that knowledge through his own labor in the New York State Attorney General's Office and other offices for almost four decades. A relator's knowledge is considered independent when, as here, it precedes the public disclosure. *Hansen*, 107 F.Supp.2d at 1182 (because relator was "responsible for the public disclosure of the allegations in the [media], it appears his knowledge is independent") (internal quotations omitted).

A relator has direct knowledge of the information supporting its false claims allegations when the relator, like Prather, "saw [the fraud] with his own eyes and his knowledge was unmediated by anything but [his] own labor." *Wang v. FMC Corp.,* 975 F.2d 1412, 1417 (9th Cir. 1992) (internal quotations omitted); *see also U.S. v. Alcan Elec. and Engineering, Inc.,* 197 F.3d 1014, 1020 (9th Cir. 1999) (a relator "must show that he had firsthand knowledge of the alleged fraud and that he obtained this knowledge through his own labor unmediated by anything else") (internal quotations omitted).

Relator has both direct and independent knowledge of Defendants' false claims. Throughout the Complaint, Relator provides evidence of Defendants' fraud that is far more extensive than that found in either the Nextel or Verizon Letters, as well as in the FCC Proceedings and DOJ Report. Complaint ¶¶ 44-55. Relator's knowledge is independent because it came well before any "public disclosure." Relator's knowledge is also direct as it arose firsthand from his experience as a prosecutor with wiretapping services and the resulting costs, including by way of reviewing invoices for such costs when he had final authority to sign off on these invoices as head of OCTF. Complaint ¶ 20.

Specifically, Relator states that, in addition to the two letters, he possesses knowledge of "non-documentary evidence gained in person," Complaint ¶ 60, and had "several telephone calls with representatives of the Telecoms in which even more theories for the unjustified, illegal, high charges were presented." Complaint ¶ 68. Because he served as a prosecutor prior to the implementation of CALEA, Relator can also "attest from personal knowledge, in the early and mid-1990s a wiretap cost, at the most, slightly over $2000 per month and frequently as little as several hundred dollars per month." Complaint ¶ 71. Since CALEA, Relator has seen these costs rise approximately ten fold. 2012 Affidavit ¶ 5. These are all examples of "firsthand knowledge" which Relator gained through "his own labor unmediated by anything else." *Wang*, 975 F.2d at 1417. It is important to note that Relator was not merely a prosecutor in the OCTF; he was the Deputy Attorney General in charge of that office. As such, he had direct access to bills and correspondence from the Telecoms, and regularly came across such evidence independently from any intervening person or agent.

Defendants' reasoning behind their assertions that Relator did not possess the requisite direct and independent knowledge is flawed. Defendants' repeatedly allege that Relator based his allegations on information disclosed in the FCC Proceedings.

*See* Motion at 2; *see also* Motion at 4. But Defendants mislead the Court: they fail to make clear that it is Prather himself who provided the only information addressing the costs of CALEA in the form of two affidavits submitted as a part of the FCC Proceedings. 2012 Affidavit ¶¶ 10-11. The Attorney General's comments regarding the cost of wiretaps after CALEA, to which these affidavits are attached, are based *solely* on the information provided by Relator. 2012 Affidavit ¶¶ 8-12.

### a. Relator Does Not Base His Allegations on Information Provided in the FCC Proceedings, nor the DOJ Report

Relator's allegations are not based on any information previously disclosed in either Relator's affidavit submitted in the FCC Proceedings, nor in the DOJ Report. It is exactly the opposite. Both of those documents were based on information provided by Prather himself. The public disclosure bar of the FCA bars a *qui tam* plaintiff from bringing claims "*based upon* the public disclosure of allegations." 31 U.S.C. § 3730(e)(4)(A). Thus, it follows that where a relator could only have learned of the information on which his claim is based through its public disclosure, that relator's claim is based upon publicly disclosed allegations.

Prather is simply not this type of relator. In April, 2004, Prather submitted his affidavit as an exhibit to then Attorney General Eliot Spitzer's comment to the FCC Proceedings. *See* First Prather Affidavit. Approximately six months later, Prather submitted a second, nearly identical affidavit to comments in the same proceeding. *See* Second Prather Affidavit. Prior to Relator's submission of his affidavits, the cost of CALEA to the Law Enforcement Agencies was not a topic addressed in the FCC Proceedings. Defendants' argument that Relator based his allegations on an affidavit *that he wrote* is flawed at its core.

Likewise, Relator does not base his allegations on the 2006 DOJ Report where any cost concerns are, again, based on Prather's disclosure. First, while that report discusses the cost of CALEA to the Law Enforcement Agencies, it was written nearly two years *after* Prather submitted his affidavits to the FCC Proceedings. Complaint

Exhibit E, 11-13.  Second, and more to the point, the information provided in the DOJ Report is virtually identical to the information first relayed by Prather in 2004.  Id. at 11 ("[a] law enforcement official noted that, "[w]ith CALEA, the carriers do less work but it costs approximately 10 times as much to do a CALEA-compliant tap versus a traditional tap"); *compare to* First Prather Affidavit ¶ 17 ("[t]hese fees are needlessly excessive as only minimal effort is required on behalf of a wireless carrier to provision an intercept"); *see also* 2012 Affidavit ¶ 12.  Referencing Prather's, and only Prather's assertions, both documents note that many prosecutors' offices do not have the funds to conduct necessary wiretaps as a result of the skyrocketing fees charged to the Law Enforcement Agencies by the Telecoms.  *See* Complaint, Exhibit E at 11; First Prather Affidavit ¶ 17.  Additionally, both the DOJ Report and Relator's affidavits comment on how this increased cost is nothing more than an effort by the Telecoms to make electronic eavesdropping a profit center as, under CALEA, the Telecoms are required to do far less work.  Complaint, Exhibit E at 11; First Prather Affidavit ¶ 13.  Even the dollar values discussed are the same.  *See* Complaint Exhibit E at 11; First Prather Affidavit ¶ 16.  The DOJ Report was overwhelmingly based upon information provided by Prather himself.

### b.   Relator Need Not Be An Employee of One of the Telecoms to Have Direct and Independent Knowledge

Defendants appear to create a requirement that only one of their own employees could have direct and independent knowledge.  But this is not the law.  The FCA only requires that an original source relator derived his knowledge firsthand through his own labor.  *Wang*, 975 F.2d at 1417 (an engineer-relator who had been called in to study a problem with a product had "direct and independent knowledge of the problem because he saw [it] with his own eyes" and his knowledge was "unmediated by anything but [his] own labor"); *see also Houck ex rel. U.S. v. Folding Carton Admin.*, 881 F.2d 494, 505 (7th Cir. 1989) (attorney-relator had direct knowledge of alleged fraudulent distribution of settlement because his knowledge resulted from

his involvement in assisting late class action claimants in recovering money out of settlement order funds). None of these relators were employees of the companies making false claims, and *all* were found to possess direct knowledge. In fact, an employee of one of the Telecoms would not have the requisite knowledge as virtually none of Defendants' current employees would have the same pre-CALEA experience given the great technological changes post-CALEA in delivery of eavesdropping services. And none of the Telecoms' employee have heard the nonsensical and contradictory explanations for the inflated bills, which Prather did. Prather did not need to be an employee of Defendants.

### c. Nextel and Verizon Letters Do Not Encompass the Scope of Relator's Direct Knowledge, But Simply Corroborate Relator's Independent, Personal Knowledge of Defendants' False Claims

Relator includes the Nextel and Verizon Letters as exhibits to the Complaint to support his own firsthand knowledge, and as an example of an admission of overcharging. These letters were hardly meant to summarize Relator's direct knowledge. In the Complaint, Relator specifically states that, in addition to these letters, he has "non-documentary evidence gained in person." Complaint ¶ 60. Relator further pleads that he "can attest from personal knowledge, [that] in the early and mid-1990s a wiretap cost, at the most slightly over $2000 per month and frequently as little as several hundred dollars per month," Complaint ¶ 71, whereas "the average cost for a wiretap [in 2007] was almost $50,000." Complaint ¶ 46. These observations are examples of what Relator relies upon to form the requisite direct knowledge. The Nextel and Verizon Letters, which contain virtually none of this information, merely corroborate the false claims that Prather directly witnessed.

In any event, while the Letters do not constitute the entirety of Prather's firsthand knowledge, they do impart some direct knowledge of the Telecoms' false claims. A relator must "see the fraud with [his] own eyes or obtain [ ] knowledge of it through [his] own labor unmediated by anything else." *Devlin*, 84 F.3d at 361.

However, if a Relator then conducts his own investigation and adds significantly to the information already obtained, Relator would still be considered an original source. *Id.* at 361-62.  As noted above, Prather's knowledge consists of firsthand observations of the Telecoms' fraudulent billing practices post-CALEA, and the effects of that fraud on the ability of the Law Enforcement Agencies to investigate crime.  *See* 2012 Affidavit ¶¶ 1-3; *see also* Complaint ¶ 41.  The Nextel Letter in particular highlights this fraud as Nextel specifically admits to inflating invoices to the New York Office of the Attorney General to amortize the software and hardware upgrades necessary for CALEA compliance.  Complaint, Exhibit F.  This is specifically prohibited by law.

Defendants' assertion that, because both the Verizon and Nextel Letters were addressed to other individuals in the New York Office of the Attorney General, any information derived from them is secondhand, is not convincing.  Defendants' rely on *Devlin* in which the Ninth Circuit found that a relator who learned of fraud through interviews with and letters from *another employee* who actively "participated in the fraud by falsifying records" and who did *not* "see fraud with [his] own eyes" did not have direct knowledge.  *Devlin*, 84 F.3d at 360.  Relator's knowledge is distinguishable from that of the relator in *Devlin*.  First, and, again, the Verizon and Nextel letters are merely corroborating evidence.  Second, Prather came across these letters on his own, and not by interviewing or seeking out another source.  As such the Letters are not the same as an email obtained through an individual reporting fraud.  *U.S. ex rel. Feldstein v. Organon, Inc.*, 2009 WL 961267 (D.N.J. April 7, 2009).  There was no "intervening agency" here.  *Id.*

In an attempt to emphasize the alleged "secondhand" nature of the letters, Defendants take their circular reasoning one step further and contend that, as the "Nextel and Verizon [Letters] were disclosing to the government *the very purported fraudulent conduct that Relator challenges*" they could not convey direct knowledge.  Motion at 16.  To adopt such a rule, the Court would have to hold that any document

sent by a company making false claims would constitute only secondhand knowledge for FCA purposes.  In other words, a relator could never rely on fraudulent invoices sent to a government to support its allegations.  This is in direct opposition to the purpose of the FCA, which is to encourage those with knowledge of fraud against the Governments to come forward.

### 2.   Relator Voluntarily Provided This Information to the Government Before Filing This Action

Relator provided the information supporting his false claims allegations to the Governments voluntarily.  It was at no time part of his job as an organized crime prosecutor to investigate or monitor the billing practices of government service providers, such as the Telecoms, and Relator submitted additional information to the Government prior to filing this action.  2012 Affidavit ¶¶ 1-2; *see also* Complaint ¶ 14. In addition to possessing "direct and independent knowledge on which the allegations are based," as Prather does, the FCA requires that an original source "voluntarily provided the information to the Government before filing an action." *Devlin*, 84 F.3d at 360 n. 3.  A relator who discovers false claims through the course of his employment may still voluntarily present those allegations to the Government if, as with Prather, it was his job requirement to do so.  *Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1476 (9th Cir. 1996) (an Army Corps attorney was an original source because his job was not to expose fraud perpetrated on the Corps, but to draft contracts and perform other legal services for the Corps).  Likewise, "[s]ection 3720(e)(4)(A) cannot be used to prohibit all government employees from bringing *qui tam* actions simply because those actions are based upon information acquired by the government employee in the course of his government employment," as long as that employee brings his claims in his capacity as a private citizen.  *U.S. ex rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1501 (11th Cir. 1991).

Defendants are simply incorrect when they claim that, because Relator's position at OCTF involved investigating fraud perpetrated by organized crime

groups, he did not voluntarily provide the affidavits to the Government. Defendants rely on Relator's assertion that "OCTF has offices across the State of New [York] and conducts long-term investigations into narcotics trafficking, gambling, money laundering, smuggling, labor racketeering, prostitution, grand larceny, official corruption, and <u>fraud</u>," First Prather Affidavit ¶ 3 (emphasis in original), to state that Prather submitted the affidavits to the FCC Proceedings as part of his job responsibilities, and, as such was not an "independent whistle-blower." Motion at 19.

This rationale is flawed at its core—the purpose of the *Organized Crime* Task Force is to investigate *organized crime*, not to monitor the billing practices of government service providers, such as the Telecoms. 2012 Affidavit ¶ 2. The Telecoms were never targets of OCTF. Prather was at no time obligated to submit this information to the government. Id. He did so only because, on his own, he recognized the harm Defendants' practice of overcharging caused the Law Enforcement Agencies. Defendants should have been the partners of OCTF in going after dangerous criminal organizations, rather than imitating those criminal organizations in their own, massive, organized, and long term fraud.

Moreover, Prather's 2004 contributions to the FCC Proceedings were not the only times he notified the Governments of Defendants' false claims. Prior to filing this action, and as required by the FCA, Prather submitted the requisite documentation to the appropriate government offices. Thus, regardless of any discussion of the affidavits, Relator "voluntarily provided the government with his information before he filed this action." *U.S. ex rel. Hansen v. Cargill, Inc.,* 107 F.Supp.2d 1172, 1182 (N.D. Cal. 2000).

### 3. The Information Relayed by Relator Led to the Disclosure of the Telecoms' False Claims Practices in the Initial FCC Investigation and DOJ Report

Relator was also the original source of the information that Defendants allege was publicly disclosed in the FCC Proceedings and DOJ Report. In addition to the

FCA's requirements that an original source have direct and independent knowledge, and have voluntarily provided this information to the government prior to filing the action, both the Second and Ninth Circuits impose a third requirement that an original source must also have been a source of the information that was previously publicly disclosed. *Wang v. FMC Corp.*, 975 F.2d 1412, 1418 (9th Cir. 1992) ("all those who directly or indirectly disclose an allegation might qualify as its original source"); *U.S. ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 16 (2d Cir. 1990) (relator must be "directly or indirectly . . . a source to the entity that publicly disclosed the allegations on which [the] suit is based"). The Ninth Circuit further provides that "[a]nyone who helped to report the allegation to either the government or the media would have indirectly helped to publicly disclose it." *Wang*, 975 F.2d at 1418. Thus, one who "had a hand in the public disclosure of the allegations that are part of his suit" meets this third requirement. *Id.*

As Relator not only "had a hand in" but was the primary source of the allegations which were disclosed in the FCC Proceedings, he meets the third requirement. Relator, on his own, and not in the general course of his job responsibilities, submitted affidavits in April and November of 2004 attesting to his knowledge of the Telecoms' practices of overcharging. 2012 Affidavit ¶ 10. Prior to this, the FCC Proceedings only addressed (1) the ambiguous requirements under CALEA which lead to delay, confusion and impaired law enforcement, (2) the identification of services subject to CALEA, and (3) the adoption and enforcement of deadlines for further CALEA compliance. Motion, Ex. 4. The cost imposed by the Telecoms on the Law Enforcement Agencies was discussed at Prather's behest. Similarly, the 2006 DOJ Report, in its discussion of the Telecoms' overcharges, relies on statements made by Prather in his 2004 affidavits. 2012 Affidavit ¶ 10. As Relator's affidavits constitute much, if not virtually all, of the "public disclosure," he was clearly "a source to the entity that publicly disclosed the allegations" and, thus,

meets the third requirement of the original source test.  *Dick*, 912 F.2d at 16.

## B.  Relator Adequately Pleads the Elements of the Federal FCA Claim

### 1.  Relator Pleads Sufficient Facts to Demonstrate that Defendants Knowingly Presented False or Fraudulent Claims for Payment to the Federal Government

Relator pleads sufficient facts to give Defendants adequate notice of the claim against them of violation of the Federal FCA.  "To establish a violation of the FCA, plaintiffs must prove three elements: (1) a 'false or fraudulent' claim; (2) which was presented, or caused to be presented, to the United States for payment or approval; (3) with knowledge that the claim was false."  *U.S. ex rel. Rosales v. San Francisco Housing Authority*, 173 F.Supp.2d 987, 992 (N.D. Cal 2001); *see also* 31 U.S.C. § 3729(a)(1). Relator has satisfied each of these elements in the Complaint, and all three are addressed in turn below.

Relator adequately identifies the actual claims for payment that were submitted by Defendants.  *See* Complaint ¶ 76 ("Carrier defendants. . . submitted fraudulently high invoices to law enforcement agencies nationwide for eavesdropping services"); Complaint ¶ 45 ("The Carriers continue to submit false claims—month after month after month—for their provision of services to investigators simply by inflating the monthly bills for eavesdropping charged to the Governments"). The Congress even made clear through passage of CALEA—which provided funds not for eavesdropping itself, but for the software and hardware that would make eavesdropping easier—that there was a specific "reasonable" standard with regards to the costs Telecoms could charge:  "A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business."  28 C.F.R § 100.12(a).  But the Telecoms ignored the reasonable standard and simply exploited the reality that the Governments would pay pretty much whatever the Telecoms charged.  *See* Complaint ¶ 40 ("[The costs submitted by Telecoms to the Governments] were monstrously more than what the Telecoms could

ever hope to charge for similar services in an open, competitive market and the costs charged. . . did not represent reasonable prices as defined in the Code of Federal Regulations"); Complaint ¶¶ 44-45 ("Carriers . . . inflat[ed] the monthly bills for eavesdropping charged to the Governments," and "charged [Prosecutors] exorbitant rates for eavesdropping services"). As stated in the Complaint, these invoices, by charging unreasonable expenses, constituted false claims under the FCA. *See Strom ex rel. U.S. v. Scios, Inc.*, 676 F.Supp.2d 884, 891 (N.D. Cal. 2009) (holding that claims for reimbursement for use of drug in outpatient treatment, where statute permits reimbursement only for "reasonable and necessary treatments," were statutorily ineligible for reimbursement when prescription of drug was not "reasonable" or "necessary," and thus "satisfied the FCA's requirement of a 'false' statement"); *see also U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996) ("[t]he archetypal *qui tam* FCA action . . . [is] filed by an insider at a private company who discovers his employer has overcharged under a government contract"); *U.S. ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1170 (C.D. Cal. 2006) ("where *a private company overcharges under a government contract*, the claim for payment is itself literally false or fraudulent").

Defendants' statement that Relator alleges no false claim because the Complaint provides no definition for "reasonable expenses" within the context of 18 U.S. § 2518(4) is misplaced. In the Complaint, Relator cites 28 C.F.R § 100.12(a) for a statutory definition of reasonable expenses for the purposes of CALEA. Complaint ¶ 38. Although this definition of reasonable is used here specifically in the context of costs associated with implementing CALEA, it should also be understood with the general purpose of CALEA in mind—in particular, to allow Law Enforcement Agencies to engage the services of Defendants in the most efficient and cost-effective way possible. Because this portion of the C.F.R, 28 C.F.R § 100.12(a), and the cited portion of OCCSSA, 18 U.S. § 2518(4), deal with costs directly associated with

wiretapping, it is perfectly logical to understand the definition of reasonable as applying equally in both contexts.

Even if the use of the definition from 28 C.F.R § 100.12(a) is erroneous, as Defendants claim, Defendants' argument is still inapplicable, as "reasonable" is an objective standard that has a basic meaning, regardless of the context in which it is used, and 28 C.F.R § 100.12(a) still provides an excellent summation of what that standard is, and particular to the eavesdropping context. If Defendants were correct, then the expenses charged to Law Enforcement Agencies by Defendants for providing surveillance services could never be unreasonable, since "reasonable" is not statutorily defined in OCCSSA. Defendants' monstrous overcharging—what Relator estimates to be a multiple of ten times what the actual charges should have been—constitutes false claims.

## 2.  Relator Adequately Pleads Scienter, Which May Be Pleaded Generally

Defendants had scienter with respect to the fraud they perpetrated on the Governments. The scienter requirement of the FCA is defined in 31 U.S.C. § 3729(b)(1), which states that "knowing" or "knowingly" "means that a person, with respect to information; (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." *Id.* The Ninth Circuit has held that the scienter requirement, with respect to the FCA, is not equivalent to the requirement in typical fraud cases. *Wang*, 975 F.2d at 1420 ("The Act's scienter requirement is something less than that set out in the common law"). This Court has also recognized a more limited scienter requirement in FCA actions, holding that "[w]hile . . . FCA cases frequently rely on the word 'lie,' it is clear that this term is used to address the falsity of a claim, rather than whether the defendant has actual knowledge of falsity. Adopting the latter as the benchmark for FCA claims would directly conflict with the statutory language. . . ." *Strom*, 676 F.Supp.2d at 891.

Applying this less stringent scienter requirement, Relator adequately pleads that Defendants committed knowing fraud.

Viewed in light of Relator's statements in the Complaint that Defendants submitted invoices to the Governments that contained unreasonable charges for the electronic surveillance services that Defendants provided, Relator's additional claims regarding the non-itemization of invoices (*see, e.g.* Complaint ¶¶ 42-43), the use of the most expensive method of delivery (*see, e.g.* Complaint ¶¶ 49-55) , and the Nextel and Verizon letters (*see* Complaint ¶¶ 59-67), adequately demonstrate Defendants' "deliberate ignorance" or "reckless disregard" of their actual overcharging of the Governments.  Relator pleads several times in the Complaint that Defendants refuse to itemize their bills so that the Governments are unable to determine whether the charges are inflated or not.  *See* Complaint ¶¶ 42-43 ("the invoices submitted to Law Enforcement Agencies contain one lump sum. . .  [w]ithout itemization, it is very difficult when reviewing any one invoice to determine that the costs are inflated"); Complaint ¶ 45 (due to Defendants' refusal to itemize their invoices, "[t]he prosecutors have no way of knowing if the fees actually represent the services provided to them during that billing cycle").  Relator also states that Defendants' use of the most expensive delivery method was a deliberate choice by Defendants that contributing to the inflated, unreasonable prices.  *See* Complaint ¶¶ 49-54; Complaint ¶ 58 ("By . . . giving no choice as to which delivery method is used for CALEA wiretaps, Carriers have been able to charge law enforcement agencies exorbitant fees for eavesdropping").  Collectively, these allegations illustrate that, at the very least, Defendants were aware that they were overcharging the Governments, and intentionally disregarded that information by going to considerable lengths to conceal the itemized pricing information from the Governments, and, by routinely providing them with only the most expensive delivery method for the wiretaps.  Defendants knew exactly what they were doing.

1

2

## C.  Relator Pleads the FCA Claims with Particularity, Satisfying Rule 9(b)

3

4

In addition to meeting the pleading standard under Rule 12(b)(6), Relator pleads his claims with the requisite particularity under Rule 9(b).  To meet the pleading standard established by Rule 9(b), allegations of fraud must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong."  *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993).  As Defendants have noted, in order to satisfy this requirement, normally "[a] *qui tam* relator must . . . set forth the time, place, and specific content of each alleged act of fraud."  *U.S. ex rel. Friedland v. Environmental Chemical Corporation*, 2003 WL 23315783 at *8 (N.D. Cal. 2003).  However, when, as here, a relator alleges false claims under the FCA that occur over a long period of time, and the number of claims grows to be unwieldy, this Court has held that the standard for determining particularity under Rule 9(b) may be different.  *Strom*, 676 F.Supp.2d at 893.  In this type of situation, "given the purposes of Rule 9(b), the specifics of all claims are unnecessary at the pleading stage."  *Id.* at 893; *see also U.S. ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1051 (9th Cir. 2001) ("Rule 9(b) may not require [the Relator] to allege, in detail, all facts supporting each and every instance of false testing over a multi-year period").  Thus, "if [a relator's complaint] cannot allege the details of an actually submitted false claim, [it] may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted."  *U.S. ex rel. Grubbs v. Kannegani*, 565 F.3d 180, 190 (5th Cir. 2009).  Given the nature of the fraudulent scheme alleged in the Complaint, this reduced pleading standard should be applied here.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Relator pleads with sufficient particularity all the elements that are required by Rule 9(b). Relator clearly specifies the who ("Carrier Defendants," or any combination of Carrier Defendants with respect to the false claims under the respective State FCAs); the what ("false claims for payment. . . regarding the costs involved in conducting ongoing eavesdropping activities"); the when ("Carriers have continuously overcharged. . . for eavesdropping from 1994 to the present. This overcharge is ongoing. . . even as the Complaint is filed"); and the where ("Federal, State, and Local Governments," the latter two of which are specified by Relator's individual State FCA claims). Complaint ¶¶ 56-57. These details of the scheme are supplemented by Relator's allegations regarding Defendants' refusal to itemize their invoices, or routine selection of the most expensive delivery method for the wiretaps, Complaint ¶ 58, which, taken along with the facts referenced above, are "reliable indicia" that provide a "strong inference" of a deliberate, years-long scheme to defraud the Governments.

Even if certain elements of the Rule 9(b) pleading standard are not pleaded with particularity, Relator's own role with respect to Defendants' fraud necessitates a reduced pleading standard. Relator is not an employee insider, so although he already possesses many of the details and "reliable indicia" that allow him to plead fraud with a certain amount of particularity, much of the information that would otherwise prove the fraud is in the possession of Defendants. *See, e.g., Lee*, 245 F.3d at 1052. Whereas the plaintiff in *Lee* had "no legitimate excuse for filing a vague complaint that does not assert particular details to support its allegations of fraud," *id.*, the relator there had worked as a supervisor for over twenty years at defendant SmithKline Beecham, Inc. *Id.* In contrast, Relator is a government employee, and though he obtained a significant amount of detail regarding Defendants' fraud during the course of his employment, he cannot reasonably be expected to provide the same level of detail that a long-tenured private employee such as Lee could be. Relator

should be held to a relaxed standard under Rule 9(b), which, again, is a standard that he easily meets.

### D. Relator Makes Sufficient, Particularized Allegations Regarding the False Claims of AT&T and Qwest, Such That Relator's Claims Against All Defendants Are Adequately Pleaded

Defendants' assertion that the Complaint does not satisfy Rule 9(b) as to each Defendant is also erroneous, as Defendants are all telecommunications providers with the exact same or substantially similar roles with respect to the fraud that Relator alleges.   Both AT&T and Qwest are identified as "Carrier Defendants" in the Complaint.  Complaint ¶ 24 ("AT&T is a telecommunications provider"); Complaint ¶ 27 ("Qwest is a telecommunications carrier"); Complaint ¶ 75 ("Carrier defendants consist of telecommunications carriers who are responsible for providing surveillance services to law enforcement agencies nationwide").  In fact, of the Telecoms, AT&T, with its vast network, is responsible for a large portion, if not the largest portion, of eavesdropping overcharges.  Complaint ¶ 24.  Relator's claims with respect to the Federal FCA, Complaint ¶¶ 72-78, are brought against *all* Carrier Defendants. Complaint ¶ 76 ("*Carrier defendants* knowingly submitted fraudulently high invoices. . .") (emphasis added).  This is emphasized in Prather's 2004 Affidavits, incorporated by Defendants as exhibits their Motion.  Motion at Ex. 4 and Ex. 7.  Prather specifically points to false claims made by both Nextel and AT&T. *See* First Prather Affidavit ¶¶ 18(a), 18(e); Second Prather Affidavit ¶¶ 19(a), 19(e).  Thus, Relator's allegations apply equally to all Defendants that are defined as "Carrier Defendants" in the Complaint, including both AT&T and Qwest.

Both cases that Defendants cite in their Motion that purportedly require Relator to differentiate among Defendants do not apply here, as they both contain substantially different sets of facts than in this action.  In *Swartz v. KPMG, LLP*, 476 F.3d 756 (9th Cir. 2007), plaintiff pled a conspiracy with respect to a tax shelter scheme, where, as the Court noted, "each conspirator may be performing *different tasks* to bring about the desired result."  *Id.* at 764 (internal quotations and citations omitted) (emphasis added).  When pleading a conspiracy, it is obvious that "plaintiff must, at a

minimum, identify the role of each defendant in the alleged fraudulent scheme," *Id.* at 765 (internal quotations and citations omitted), since each defendant is working in concert to produce a desired result.  Similarly, in *U.S. ex rel. Friedland v. Environmental Chemical Corporation*, 2003 WL 23315783 (N.D. Cal 2003), plaintiff alleged that defendants, consisting of separate corporations and individuals, "conspired to defraud the United States."  *Id.* at *3.  As with *Swartz*, the Court's statement that "the complaint must satisfy Rule 9(b) as to each defendant," *id.* at *9, should be read in light of plaintiff's conspiracy claim.  In contrast, Relator Prather does not allege any conspiracy between Defendants in this case, and Defendants are all functionally similar or identical entities with respect to this litigation.  Given this, Relator need not differentiate among Defendants, and can allege his claims as to all Defendants as he has done in the Complaint.

## E. Because Relator's State and Local FCA Claims Are Substantially Similar to Relator's Federal FCA Claim, the State and Local Claims Should Also Survive Dismissal

Because the State and Local FCAs are nearly identical to the Federal FCA, Relator adequately pleads his State and Local claims.  As Defendants' themselves provide "each of the state FCAs was enacted after, and closely parallels the federal FCA".  Motion at 32.  As such, when "a state law is patterned after a federal law, the two are construed together . . . [and] the federal cases interpreting the federal law offer persuasive authority."  *In re Nuveen Funds/City of Alameda Securities Litigation*, 2011 WL 1842819 at *16 (N.D. Cal. 2011) (internal citations omitted).  For the same reasons that Relator is an original source of the information supporting his allegations under the FCA, he is also an original source under the State and Local FCAs.

Additionally, Relator sufficiently pleads that he meets the third original source requirement imposed by the California, District of Columbia, Nevada, and New Hampshire FCAs.  These jurisdictions all require that a relator be the "basis" or "catalyst" of the investigation that led to the "public disclosure" of the allegations.  Cal Gov. Code § 12652(d)(3)(B); D.C. Code § 2-381.03(c)(2)(B); Nev. Rev. Stat. §

357.100(2); N.H. Rev. Stat. § 167:61-b(V)(c).  However, as discussed above in § A(3), both the 2nd Circuit and 9th Circuit also impose a similar requirement, that an original source must also have been a source of the information that was previously publicly disclosed.  *Wang v. FMC Corp.*, 975 F.2d 1412, 1418 (9th Cir. 1992).  This is precisely what Relator was.  2012 Affidavit ¶¶ 8-12.  Relator came forward, on his own, and sought to draw the Governments' attention to his claims.  2012 Affidavit ¶ 10.  Before Relator submitted his affidavits, the FCC Proceedings had nothing to do with the Telecoms' overcharges.  2012 Affidavit ¶ 9.  The only reason this was included in the discussion, and later in the DOJ Report, is because Relator brought the information to light.  Prather was the catalyst of the portion of the FCC Proceedings, which brought about the disclosure of the information supporting his allegations.

Finally, Relator adequately pleads his State and Local FCA claims under Rule 9(b).  Again, as the State and Local FCAs are substantially the same as the Federal FCA and for the reasons discussed above in § C, Relator pleads these claims with the requisite particularity.

**F. Deficiencies – If Any – In Relator's Complaint Can Be Cured Through Amendment**

In the event the Court determines there exist deficiencies in Relator's pleading, Relator requests the opportunity to replead and include additional facts substantiating his claims.  At the pleadings stage, leave to amend "shall be freely given when justice so requires."  Federal Rules of Civil Procedure 15(a).  Generally, this policy is "to be applied with extreme liberality."  *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003).  *See also Moss v. U.S. Secret Service*, 572 F.3d 962, 972 (9th Cir. 2009) ("[c]ourts are free to grant a party leave to amend whenever justice so requires . . . and requests for leave should be granted with extreme liberality"); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962) ("where a complaint is dismissed . . . plaintiff should be offered at least one opportunity to replead in order to correct the defects in the original complaint.").  Further, in determining whether

leave to amend is appropriate, the Court should consider "the presence of any of four factors: bad faith, undue delay, prejudice to the opposing party, and/or futility." *Griggs v. Pace Am. Group, Inc.*, 170 F.3d 877, 880 (9th Cir. 1999) (noting that inferences should be drawn "in favor of granting the motion"). In the absence of these factors, the leave sought should be liberally given. *Foman*, 371 U.S. at 182.

Not one of these four factors is present here. Defendants do not dispute the first three factors, merely alleging that "amendment would be futile" because the Telecoms' "overcharges are not false statements or misrepresentations" and "the flaws in Relator's complaint cannot be cured through amendment." Motion at 35. However, this is not true – Defendants again use their circular reasoning to misrepresent the FCA, without ever denying that they purposely overcharged the Governments to make a profit. As discussed above, presenting unreasonable overcharges to the Government *is a false statement* under the FCA. *See supra* § B(1); *see also U.S. ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1170 (C.D. Cal. 2006) ("where a private company overcharges under a government contract, the claim for payment is itself literally false or fraudulent"). The False Claims Act is meant "to reach all types of fraud, without qualification, that might result in financial loss to the government." *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996). Defendants then hid these misrepresentations by refusing to itemize their bills. Complaint ¶¶ 42-43. As such, Relator's theory of fraud is perfectly compatible "with the actual meaning fraud", despite Defendants' assertions otherwise. Motion at 35. Any factual deficiencies in Relator's Complaint can be corrected if Relator is granted the opportunity to replead.

## CONCLUSION

Defendants were supposed to be working as the partners of the Law Enforcement Agencies, helping prosecutors, like Relator, build cases against organized criminals. Instead, they were submitting false claims themselves for well over a decade. And nowhere in their Motion do Defendants deny that they have

massively overcharged the Governments.  Instead, they make procedural arguments that fail: Relator is an original source, who had no obligation to disclose the false claims, such that any public disclosure—based on Relator's own affidavits, which he went out of his way to submit—does not relieve this Court of jurisdiction.  The Complaint gives adequate notice to Defendants of their fraud, laying out how all four remaining Defendants submitted false claim after false claim for years.  The Motion should be denied, and this action should proceed into discovery.

Dated: February 28, 2012          By:     /s/ John Balestriere
        New York, New York                 John G. Balestriere*
                                           Jillian L. McNeil**
                                           Email: john.balestriere@balestriere.net
                                           **BALESTRIERE FARIELLO**
                                           225 Broadway, Suite 2900
                                           New York, NY 10007
                                           Telephone: (212) 374-5401
                                           *Attorneys for Plaintiff/Relator*
                                           *Admitted Pro Hac Vice*
                                           **Passed July 2011 New York Bar Exam,*
                                           *Awaiting Admission to New York Courts*

                                           David J. Miclean
                                           Email: dmiclean@micleangleason.com
                                           **MICLEAN GLEASON LLP**
                                           100 Marine Parkway, Suite 310
                                           Redwood Shores, CA 94065
                                           Telephone: (650) 684-1181
                                           Facsimile: (650) 684-1182
                                           *Co-Counsel*

                                           *Attorneys for Plaintiff-Relator*