Volume 1

Pages 1 – 30

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CHARLES R. BREYER, JUDGE

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel.<br>JOHN C. PRATHER, et al.,<br><br>            Plaintiff-Relator,<br><br>  VS.<br><br>AT&T, INC., et al.,<br><br>            Defendants.<br>_____ | )<br>)<br>)<br>)<br>)<br>) NO. C 09-2457 CRB<br>)<br>)<br>)  San Francisco, California<br>)  Friday<br>)  April 20, 2012<br>)  10:46 a.m. |

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff-Relator:
                    BALESTRIERE FARIELLO
                    225 Broadway
                    Suite 2900
                    New York, New York  10007
               BY:  JOHN G. BALESTRIERE, ESQ.
                    and
                    MICLEAN GLEASON, LLP
                    100 Marine Parkway
                    Suite 310
                    Redwood Shores, California  94065
               BY:  DAVID J. MICLEAN, ESQ.


For Defendant AT&T:
                    SIDLEY AUSTIN, LLP
                    555 West Fifth Street
                    Suite 4000
                    Los Angeles, California  90013
               BY:  DOUGLAS A. AXEL, ESQ.

(Appearances continued, next page)

APPEARANCES, CONTINUED:

For Defendant Cellco Partnership, d/b/a Verizon Wireless:
                        MUNGER, TOLLES & OLSON, LLP
                        560 Mission Street
                        27th Floor
                        San Francisco, California  94105-2907
               BY:   JONATHAN H. BLAVIN, ESQ.
                        KRISTIN LINSLEY MYLES, ESQ.


For Defendant Sprint NexTel:
                        WILLIAMS & CONNOLLY, LLP
                        725 Twelfth Street, N.W.
                        Washington, D.C.  20005
               BY:   EDWARD C. BARNIDGE, ESQ.
                        SHELLEY J. WEBB, ESQ.


For Defendants Sprint NexTel Corporation and Qwest
Communications International:
                        PERKINS COIE, LLP
                        1201 Third Avenue
                        Suite 4800
                        Seattle, Washington  98101-3099
               BY:   DAVID F. TAYLOR, ESQ.




Reported by:            BELLE BALL, CSR #8785, RMR, CRR
                        Official Reporter, U.S. District Court

1  **FRIDAY, APRIL 20, 2012**                    **10:46 A.M.**

2                      **P R O C E E D I N G S**

3          **THE CLERK:**  Calling Civil Case 09-2457, John Prather

4  versus AT&T, Incorporated.  Counsel, please state your

5  appearances for the Record.

6          **MR. BALESTRIERE:**  John Balestriere for Plaintiff

7  Prather and the United States, and several states.  My

8  Co-counsel, Dave Miclean, is here.

9          Good morning, Your Honor.

10         **THE COURT:**  Good morning.

11         **MR. AXEL:**  Good morning, Your Honor.  Douglas Axel on

12 behalf of AT&T.

13         **MR. BLAVIN:**  Good morning, Your Honor, Jonathan

14 Blavin on behalf of Defendant Cellco Partnership, d/b/a Verizon

15 Wireless.

16         **MS. MYLES:**  Good morning, Your Honor.  Kristin Myles

17 of Munger Tolles and Olson on behalf of Verizon Wireless.

18         **MR. BARNIDGE:**  Good morning, Your Honor.  Ed

19 Barnidge, Williams & Connolly, on behalf of Sprint Nextel.

20         **THE COURT:**  Excuse me.  Are you standing there,

21 drinking something?

22         **MR. BLAVIN:**  Oh, sorry.  It's just a glass of water,

23 Your Honor.

24         **THE COURT:**  Well, put it down.  I mean, it's okay,

25 but it's not really -- you're in court now.

```
1              (Request complied with by Mr. Blavin)

2         MR. TAYLOR:  Good morning, Your Honor.  David Taylor

3    behalf of Sprint Nextel Corporation and Qwest Communications

4    International.

5         MS. WEBB:  Good morning, Your Honor.  Shelley Webb of

6    Williams & Connolly, on behalf of Defendant Sprint Nextel.

7         THE COURT:  That's all right.  Don't take it too

8    personally.

9         MR. BLAVIN:  I won't.  I apologize again, Your Honor.

10        THE COURT:  Well, take it personally enough, but

11   don't -- it's okay.  It's -- a lot of things have happened,

12   much worse than that.  I mean, go ahead.

13        MR. BALESTRIERE:  I'm Plaintiff, Your Honor, so I'm

14   not sure if you want to hear from the Defendants first, or if

15   you want to hear our position.

16        THE COURT:  No, I want to tell you what I'm

17   interested in.  I'm interested in the lawsuit.  That's probably

18   the good news and the bad news.

19             But, here's what I'm trying to figure out.  I'm

20   trying to figure out whether the Plaintiff qualifies to bring

21   this lawsuit.  Specifically, whether he voluntarily disclosed

22   the information and was the original source.  And I have a

23   number of concerns about that, and let me sort of articulate

24   them, to the extent I'm able to.

25             First, I don't know whether, quote, "the victim," end
```

1    quote, can really be a person who can really bring a qui tam

2    action.  That is to say, is the person who is defrauded -- and

3    I'm using -- I understand the Defendants don't believe there

4    was any fraud, and so forth.  So, but I'm using it in a -- as a

5    term of convenience.

6           The person who was the so-called victim of a fraud,

7    whether that's a person who is, quote, "a whistleblower," and

8    entitled to bring a qui tam action.  If the answer is yes, I

9    would be surprised.  I would be surprised if the answer is yes.

10   It could be.

11          But, I would think that almost, then, any victim who

12   alerts law enforcement that he or she is being victimized can

13   then bring a qui tam action, which I don't think is right.  I

14   don't think that that's what the statute is designed.  It's

15   designed as a whistleblower in the sense that it is a person

16   who is privy to -- and "privy" is a -- privy to the inside

17   workings of the company or entity or defendant who is actually

18   defrauding.

19          That is to say that person is, as a general rule, an

20   employee of the company who is -- of the wrongdoer who is

21   observing the wrongdoing.

22          So, I wonder whether some outside party who may be

23   the victim of a fraud can actually bring the qui tam action.

24   That is one general question.

25          The second general question I have is whether or not

1  this person could really be -- or any victim -- is the

2  so-called original source of the information.  Since what he's

3  done in this case is simply -- and I'm not minimizing it, but

4  it's simply adding two and two, and saying, "Oh, it's five."

5  He's got the invoices and so forth, and he comes to the

6  conclusion that it's five.  He then -- maybe he was right.

7  But, is that the original -- is that -- does he qualify then as

8  being a person with the original -- as an original source?

9          And, in particular, the *Biddle* case seems to address

10  that issue pretty conclusively.

11          A third issue is whether the Defendant's -- pardon

12  me, the Plaintiff's job responsibilities encompassed the duty

13  to disclose this information to his employer.

14          As I understand it, Mr. Prather was -- worked for the

15  Attorney General Spitzer.  And his responsibilities were to --

16  and I'm going off the affidavit that was filed, he was at --

17  what is it, OCEF --

18          **MR. BALESTRIERE:**  Organized Crime Task Force.  OCTF,

19  Your Honor.

20          **THE COURT:**  Right.  The people -- and they were sort

21  of the end users of the product.  "The product" being the

22  wiretaps.  And, conducted by the Defendants.  And they would

23  get the bills for this.

24          Okay.  I think, though it's not clear, I don't know

25  whether -- I think he says at some point that he had the

1  obligation, the responsibility, of -- and here I'm going to be

2  inexact, and I'm not quite sure -- I think some precision is

3  probably required.  But, I don't know whether he oversaw the

4  bills, approved the bills, reviewed the bills, authorized the

5  payments.  It seemed to me he had some connection with the

6  bills.

7           And, why wouldn't it be his responsibility, if he

8  gets a bill, and gets other information, why wouldn't it be his

9  responsibility to report it to his employer?  I don't

10 understand why it wouldn't be.

11          And it's not like he's just -- it's not like, "Gee,

12 you know, I get paper," or "I get a desk," or so forth, "and

13 maybe the price was fixed that I had to pay for the paper or

14 pay for the desk."  He's in a position where he is reviewing

15 these invoices, these authorizations.

16          And, why isn't it his job to blow the whistle?

17 After all, if it's his job to blow the whistle, he doesn't get

18 a qui tam action.  Because he's doing something, he's not

19 volunteering, not volun- -- he's not giving that information

20 from a voluntary point of view.

21          So anyway, I'm sure there are other concerns and so

22 forth, but those were the ones that struck me at the beginning.

23 And so, if you would like to address them, we have the time.

24          **MR. BALESTRIERE:**  Thank you.

25          **MR. BLAVIN:**  Your Honor, who would you like to hear

1    from first?  Defendants or --

2              **THE COURT:**  Pardon?

3              **MR. BLAVIN:**  Who would you like to hear from first,

4    Your Honor?

5              **THE COURT:**  I think the Plaintiffs would be --

6              **MR. BALESTRIERE:**  So, in regards to the first point,

7    about whether --

8              (Reporter interruption)

9              **MR. BALESTRIERE:**  -- with what you are calling a

10   victim, whether a victim can be a relator, a victim can.

11   There's the *Williams* case.  It's an Eleventh Circuit, 1991

12   case.

13             And actually, I'll read from it.  It says (As read):

14             "But Section 3730 cannot be used to prohibit

15             all government employees from bringing qui

16             tam actions simply because those actions are

17             based upon information acquired by the

18             government employee in the course of

19             government employment."

20             And that's what we have here.  Mr. Prather, over the

21   course of 35 years, knows a lot about these wiretaps.  When he

22   was at the Organized Crime Task Force is when he had the

23   ability to see that post-CALEA, post-1995, these wiretap

24   intercept charges went up dramatically.  And that's how he came

25   in to the information.

1          Now, was it his job to blow the whistle, is what

2     you're saying.  His job was to conduct organized crime

3     investigations.  Under the New York Executive Law, he was

4     responsible for assisting other prosecutors and for bringing

5     organized crime cases when they were in several counties in New

6     York.  The Organized Crime Task Force is kind of a weird animal

7     that way.

8          He was not charged with supervising whether vendors

9     were overcharging to OCTF or to the Attorney General's office.

10    And to the extent that he came into knowledge, he tried to get

11    government interest here.  In 2004, he submitted to the FCC an

12    affidavit which Your Honor has in Mr. Blavin's declaration,

13    where he goes into extreme detail about the intercept

14    overcharges that he is seeing.  For reasons which --

15          **THE COURT:**  Oh, no, but that's not the issue.  It's

16    not the issue that -- was he knowledgeable.  The issue is did

17    he have a responsibility to disclose this information to his

18    employer.

19          **MR. BALESTRIERE:**  But then --

20          **THE COURT:**  You're saying he didn't.

21          **MR. BALESTRIERE:**  But then, Your Honor, there is the

22    *Hagood*, the 1996 Ninth Circuit decision.  Eventually that case

23    was dismissed on the second appeal, after summary judgment

24    regarding scienter.  But the Ninth Circuit found in *Hagood* that

25    an individual who is an Army Corps of Engineer attorney -- so,

1  similar to Mr. Prather -- and had a specific responsibility

2  with regards to the contract in question could still be a

3  relator.

4       Your Honor referenced *Biddle*.  *Biddle*, it was

5  different in that the --

6       **THE COURT:**  Let's talk about *Hagood* for a minute,

7  because that was an opinion written by Judge Sneed.

8       **MR. BALESTRIERE:**  Yes, Your Honor.

9       **THE COURT:**  And Judge Kleinfeld wrote a concurring

10  opinion.  And Judge Kleinfeld, of course, concurred in the

11  result.  And then he's saying (As read):

12       "We err, I think, in deciding that *Hagood* was

13       an original source who voluntarily provided

14       the information.  He was a lawyer charged

15       with the duty of drafting a contract and

16       other documents for the transaction at issue.

17       If he thought the transaction was fraudulent,

18       he was 'required to give an honest opinion'

19       to his client and 'may not knowingly assist a

20       client in criminal or fraudulent conduct.'"

21       And it went on to say:

22       "The issue here is distinct from whether a

23       government lawyer who discovers fraud in a

24       matter unrelated to his own duties can

25       recover in a qui tam action.  Had Hagood

1              heard from a carpool acquaintance about a

2              fraud in some other agency, then the question

3              we left for another day in *Fine* would be

4              before us.  But a lawyer working on a

5              transaction has a duty as an agent to

6              disclose to his principal 'information

7              relevant to matters within his province and

8              of which he should know the principal would

9              want to know.'  Because Hagood provided the

10             information to his agency pursuant to his

11             legal duty, he did not do so voluntarily."

12         Now, that's a concurrence.  But if that's the law, if

13    that were the law, you'd be out.  Right?

14         **MR. BALESTRIERE:**  No, Your Honor.  And here's why.

15    Mr. Prather was not responsible for managing the transaction in

16    question.  That's something that was separate.  There was a lot

17    of debate in the early 2000s about this:  How did the carriers,

18    the Defendants here, end up charging the law enforcement

19    agencies, and so forth.

20         But Mr. Prather, like a typical relator who is not an

21    insider -- because there are many cases where relators are not

22    actually insiders at the Defendant company -- saw the invoices.

23    He saw the false claims.  And, that *Hagood*, as Your Honor said,

24    that's a concurrence anyway.  But *Hagood* was responsible for

25    working on the actual Sonoma Valley agency transaction in

1    question.

2            But nonetheless, the Ninth Circuit, even there, said

3    that he -- the case should proceed.

4            **THE COURT:**  I'm trying to find the affidavit.

5            **MR. BALESTRIERE:**  Mr. Prather's affidavit?

6            **THE COURT:**  Yes.

7            **MR. BALESTRIERE:**  I can see if I can find that, as

8    well.  But -- and then there is the -- the -- the *Williams*, the

9    1991 decision that I referenced, Your Honor.

10           With regards to *Biddle*, the Office of Naval Research

11   had some -- kind of like the *Hagood* concurrence rule, because

12   there you had an actual Naval attorney who was at Stanford who

13   is responsible for the specific transactions in question.  And

14   there is language in that decision akin to that of Judge

15   Kleinfeld's.  He had an obligation to report.

16           I mean, one thing to remember here is that

17   Mr. Prather did try to get government attention in this.

18           **THE COURT:**  Well, what does that mean?

19           **MR. BALESTRIERE:**  Well, I'm saying if the concern --

20   if the reason we have the rule is because we don't want someone

21   to hold onto the information and become a false claims

22   relator -- the 1995 *Fine* decision goes into this, in the

23   dissent, that -- what -- why we care about voluntariness.  We

24   don't want someone to find out some bad information, not report

25   it to their superiors, hold onto it, quit, do whatever, and

1   then bring an action as a private citizen.

2          It's not what Mr. Prather did here.  In 2004, he

3   raised this issue of concern to the Department of Justice, to

4   the FCC.  And again, for reasons which are not clear, they did

5   not do anything about it.  Because, as Mr. Prather pleads in

6   the filing eventually filed under seal in 2009, even at that

7   time, it was still going on.  More than five years on.  So,

8   under *Williams* and other decisions, a victim can be a false

9   claims relator.

10          And looking at *Biddle*, *Hagood*, and then the Eleventh

11  Circuit case, *Williams*, it certainly is possible even when you

12  are a lawyer -- Williams was a United States Air Force attorney

13  who the Eleventh Circuit said could have brought his claim,

14  even though there -- it's somewhat akin to *Hagood* -- he was the

15  attorney at the Air Force who learned about bid rigging when he

16  was working on contracts, there.  So the policy rules and the

17  cases are clear that he could proceed.

18          And then, just finally, with regards to his job, his

19  job was not -- he wasn't an auditor.  He did not negotiate

20  these transactions.  The Defendants make a very big issue about

21  the fact that the very last line of his affidavit -- I can find

22  it when Counsel speaks -- he says that amongst the things he

23  investigated was fraud.  And I think they underline it in their

24  initial papers.  Organized crime, criminal fraud.  Under the

25  Executive Law, he couldn't have even brought this case,

1  himself, if he wanted to.

2          **THE COURT:**  Sorry, what?

3          **MR. BALESTRIERE:**  I'm just saying that the Defendants

4  -- I think I'm responding to your last point, Your Honor.  But

5  also, what the Defendants have said, that, well, it was his job

6  to investigate fraud.  Not vendor fraud.  They were supposed to

7  be working alongside with him.  La Cosa Nostra and other kind

8  of organized crime fraud, that was what his job was to do.

9          He ended up seeing these invoices in the same way

10 that he saw the invoices for the lease of the Organized Crime

11 Task Force office, or payroll.  He did not negotiate those; he

12 did not come up with those.  But simply because he was the boss

13 at OCTF, he ended up seeing these invoices, just like the Air

14 Force attorney in *Williams* ended up knowing about the bid

15 rigging while he worked in the Air Force as an attorney.

16         **THE COURT:**  So he had no duty to -- to report this to

17 the Attorney General?

18         **MR. BALESTRIERE:**  Not in the respect of being a

19 relator.  With regards to any duty he had --

20         **THE COURT:**  I don't know quite -- whether he's a

21 relator not a relator, let me just ask you:  Did he have a

22 duty?  Did he have a duty to report this to the Attorney

23 General?

24         **MR. BALESTRIERE:**  No.  He did report it to the

25 Attorney General, because of the relationship he had with

1    Attorney General Spitzer.  And as we see in the --

2              THE COURT:  So if a person, a vendor says to -- to

3    the person who utilizes the service, "By the way, I just want

4    to tell you something," we're overcharging you for this, we're

5    overcharging you," your answer is that person who receives that

6    information has no duty to tell his employer that they're being

7    overcharged.  That is your position.

8              Is that right?

9              MR. BALESTRIERE:  I think it depends on their job.  I

10   think --

11             THE COURT:  Well, I'm telling you what his job is.

12   His job is that he's the one who authorizes the wiretap.

13   That's his job.  He says it in his declaration.

14             MR. BALESTRIERE:  Right.

15             THE COURT:  Now, Verizon, Mr. Verizon goes and knocks

16   on Mr. Prather's door, and he says, "You're going to authorize

17   these wiretaps, these -- organized crime?"

18             "Yes."

19             "Well, I just want to tell you one thing.  You're

20   being overcharged."

21             And your statement to me is he has no duty in

22   connection with his responsibilities to report that.  Is that

23   correct?

24             MR. BALESTRIERE:  No, Your Honor.  I think, there --

25             THE COURT:  Does he have a duty, or does he not have

1   a duty?

2          **MR. BALESTRIERE:**  He did not have a duty to --

3          **THE COURT:**  Pardon?

4          **MR. BALESTRIERE:**  He did not have a duty to report

5   for the purposes of a subject matter jurisdiction analysis

6   under -- under what we're talking about here, the False Claims

7   Act.  He maybe, I guess, had some kind of moral --

8          **THE COURT:**  No, I don't care about morality.  That's

9   not -- I'm not a Sunday school.

10          **MR. BALESTRIERE:**  I understand, Your Honor.

11          **THE COURT:**  I care about what the law is.  And I'm

12   asking you, under the law, does he have a -- as his duties are

13   defined, if, in fact, he were told by the defrauder that they

14   were being defrauded, did he have a duty to report that to his

15   superiors?

16          And your answer is either yes or no.

17          **MR. BALESTRIERE:**  No, under the False Claims Act.  He

18   does not, there.

19          **THE COURT:**  All right.  Okay.  All right.

20          **MR. BLAVIN:**  Okay.

21          **THE COURT:**  Let's hear from the defense.

22          **MR. BLAVIN:**  Your Honor, with respect to your first

23   inquiry relating to the purpose of the original source

24   requirement, whether or not it is intended to allow the victims

25   of the alleged fraud to come forward and serve as qui tam

1 relators:  The law is very clear within the Ninth Circuit, and

2 this Court recognized in the *Hansen* case, that the False Claims

3 Act is designed to encourage insiders to come forward with

4 genuinely valuable information that they otherwise would have

5 little incentive to do so.  That is what this Court held in

6 *Hansen*, and it cited the *Alcon* decision from the Ninth Circuit

7 in support of that.

8       And the reason why original -- I'm sorry -- that

9 relators are typically insiders, that courts have found them to

10 be the paradigmatic insiders, is because they are close

11 observers of the fraud, or otherwise engaged in the fraudulent

12 activity, as the Third Circuit noticed in the *Stinson*

13 (Phonetic) decision.  And that allows them to have --

14     **THE COURT:**  Okay, so if Mr. Prather, rather than

15 working for the Attorney General, was working for Verizon, saw

16 these invoices and so forth, could he have then been the

17 relator?

18     **MR. BLAVIN:**  Well, the --

19     **THE COURT:**  Assuming all the other conditions, not

20 public, and blah, blah, blah, blah, blah.  Would he be the

21 person that we're talking about as a legitimate relator?

22     **MR. BLAVIN:**  It would have put him in a position such

23 that he may have been able to obtain direct and independent

24 knowledge of the fraud, which the statute requires.

25     **THE COURT:**  So, you're saying that a person in

1    Mr. Prather's position can't be an original source.

2           **MR. BLAVIN:**  There's no necessarily prophylactic rule

3    prohibiting government employees from being relators.  But,

4    it's incredibly difficult.  The burden upon them is high.  As

5    the courts have recognized, outsiders generally have a much

6    higher burden to satisfy.  To obtain direct and independent

7    knowledge, and to voluntarily provide such information to the

8    government.

9           Now, the mere fact that Mr. Prather had reviewed

10   certain invoices, for example, you know, we argue extensively

11   in our papers why that doesn't constitute any direct and

12   independent knowledge of fraud.  If he was on the inside, he

13   may have gained some other piece of information which --

14          **THE COURT:**  So you're saying on the outside, he still

15   could be a relator.  But he would have the burden of showing

16   that he has -- that he's an original source.

17          **MR. BLAVIN:**  That he's an original source, which

18   means that he has direct and independent knowledge of fraud,

19   which, typically, only insiders are able to obtain.

20          **THE COURT:**  And what about his position?  Does that

21   trouble you?

22          **MR. BLAVIN:**  His position --

23          **THE COURT:**  That he is working for the Attorney

24   General, which is -- which is -- and approving the wiretaps.

25          **MR. BLAVIN:**  It troubles us greatly.  And, I would

1  say that he has not met his burden of showing that he

2  voluntarily provided any such information to the government.

3          With respect to the 2004 FCC affidavits that

4  Mr. Prather submitted to the government, those were done in

5  support of the New York Attorney General's submission to the

6  Federal Communications Commission.  He signed the affidavits in

7  his official capacity as the Deputy Attorney General.

8          He's listed as one of the authoring attorneys on the

9  New York Attorney General submission.  All of the evidence that

10 he was collecting was used within the New York Attorney

11 General's comments to the FCC.  This clearly fell within the

12 scope of his duties as a Deputy Attorney General for the State

13 of New York.

14         And, in those very FCC affidavits, Your Honor, which

15 are attached to the Blavin declaration at Exhibit 4 and

16 Exhibit 7, in Paragraph 20 of Exhibit 4, he specifically states

17 that at the OCTF, he and his office challenged the carriers for

18 what they viewed as exorbitant charges for implementing lawful

19 pen registration orders and eavesdropping warrants.

20         So the very claims that he's asserting here, he did

21 within his specific duties as a Deputy Attorney General.  And

22 it was part of his job responsibilities.

23         The only evidence in the record with respect to the

24 relator at all voluntarily providing any such information to

25 the government are these affidavits which he clearly did within

1    the scope of his duties as a Deputy Attorney General.

2           Now, with respect to the *Hagood* decision, Your Honor,

3    which was raised earlier, there, the Ninth Circuit was very

4    clear at Page 1476, Note 19, that the Army Corps of Attorneys'

5    job was not to expose fraud, but to draft contracts and perform

6    other legal services.  And here, the relator, himself, alleges

7    that part of his duties was to challenge the carriers for what

8    they viewed as exorbitant charges.

9           The only evidence providing such information to the

10   government are these FCC affidavits, which on their face were

11   done within his official paid capacities as a Deputy Attorney

12   General for the State of New York.

13          **MR. BALESTRIERE:**  May I respond, Your Honor?

14          **THE COURT:**  Sure.

15          **MR. BALESTRIERE:**  The Defendant wants there to be a

16   rule that is equating this moral responsibility that Your Honor

17   was just referencing, to say, "Look, Mr. Prather was trying to

18   do the right thing here."  I mean, there's no doubt about it.

19          But that is supposed to then mean that he cannot be a

20   false claims relator, and no government employee, contrary to

21   *Williams*, to *Hagood*, could ever be a false claims relator.  If

22   they attempted to address the concern, it wasn't addressed.

23   And then they could not bring an action later on.  That's the

24   rule that the Defendants want, which is not only contrary the

25   law, it's contrary to the perspective of what the False Claims

1    Act is supposed to be about.

2            And in the *Fine* decision, the dissent goes into how

3    limited voluntariness is supposed to be.  Mind you that it is

4    in the dissent, as Your Honor was noting, with regards to the

5    concurrence previously.

6            But, we -- why do we have these rules?  We don't want

7    a parasite.  Despite the fact that, completely wrongly, the

8    Defendants call Mr. Prather a parasite here, he is not --

9            **THE COURT:**  Forget the characterization.

10            **MR. BALESTRIERE:**  Okay, but I'm saying he's not a

11   parasite.  And then, that's what the original source --

12            **THE COURT:**  I think the proper word probably would

13   have been "opportunist," not "parasite."  That's really what --

14   they're saying he's an opportunist.  He's taking advantage of

15   an opportunity that had been presented to him.  Forget the

16   "parasite."

17            **MR. BALESTRIERE:**  Well, I guess that meant every

18   false claims relator is an opportunist, if you want them to be.

19            **THE COURT:**  I agree with that.

20            **MR. BALESTRIERE:**  But what I'm saying here is that

21   they want a rule which will greatly restrict the ability of any

22   outsider -- which is not the law -- to be able to bring a false

23   claims act.  I'm using the term "parasite" as do they, because

24   it's in the law.

25            I mean, there's a lot of Circuit Court decisions

1  which say they do not want parasitic actions, where someone

2  just found out through someone else.  There's clearly direct

3  knowledge of the fraud here.

4          **THE COURT:**  I'm not sure there's direct knowledge of

5  the fraud.  I don't know.  The direct knowledge of the fraud,

6  as I understand it, is based upon his experience of what things

7  should cost.  I don't think that is direct knowledge of the

8  fraud.

9          **MR. BALESTRIERE:**  If I may, Your Honor, that is

10 background that helped him realize by the --

11         **THE COURT:**  What's the direct -- the direct knowledge

12 of the fraud is that he's reviewed invoices, and it was

13 inconsistent with his understanding as to what is a legitimate

14 cost for running a wiretap.  That's what he's saying.

15         He's saying, "Hey, you know, let me tell you, I

16 know -- I know how this pie is made, and because I've made

17 these pies.  And boy, that's the wrong..."  Whatever.

18         **MR. BALESTRIERE:**  No, I think you're right, though,

19 Your Honor.  But that's -- that doesn't mean it isn't direct.

20 I mean, the term that is often used is that he receives his

21 knowledge unmediated by anything other than his labor.

22         He did not -- it's not like, say, the *Devlin* case

23 they rely on greatly, where there, the false claims relator

24 only learned about his information from a third party, heard it

25 somewhere else.  Or Your Honor's decision in *Hansen* which

1    Counsel just referenced, where there, that relator found out

2    the information from other parties.

3              Mr. Prather, I mean, he's the --

4         **THE COURT:** So, I'm a contractor.  I'm a contractor

5    working for the City, and I -- I get a bill from a builder

6    who's building me something.  And it's for, you know, wood, at

7    $12 a linear foot.  And I know based, upon all of my

8    experience, it should cost $3.  Right?

9              He sends me the bill for $12.  I'm an original

10   source.  Right?

11        **MR. BALESTRIERE:** You might be, but there's also more

12   here, Your Honor.  Because he challenged the Defendants on why

13   they were charging so much, because he's somebody uniquely

14   situated to know what the prices were in the Eighties and

15   Nineties.  And then he got different excuses, that they were --

16        **THE COURT:** Fine.  I mean, that actually suggests

17   that he's an investigator conducting an investigation into the

18   matter.  Which is entirely appropriate, by the way.

19             And, and, he's doing so, you're saying he's doing so

20   in his private capacity.  Because he wants to blow the whistle

21   or he's doing so in connection with his responsibilities as an

22   employee of -- of Mr. Spitzer's office.

23             And, and then, what he finds, by the way, ends up in

24   affidavits that are submitted to the administrative body.  I

25   mean, it suggests -- you're just making the case that this is

1    part of his official duties.

2            **MR. BALESTRIERE:**  No, but --

3            **THE COURT:**  That it was in the discharge of his

4    responsibilities that he did these things.  It's not like he

5    was the Inspector General.  It's not like he was the overseer

6    of costs.

7            But he came into -- he came -- he gathered

8    information, he was given information which was inconsistent

9    with information -- with his experience in the field.  And came

10   to the conclusion that there was a fraud, and reported that to

11   the Attorney General and to other regulatory bodies.

12           That seems to be -- number one, it doesn't seem that

13   he's an original source.  And number two, it seems to be well

14   within his responsibilities of Attorney General -- of an

15   employee of the Attorney General.

16           The question in my mind is whether I can really

17   decide this on the papers as it is now, or whether I should

18   allow some discovery on the issues of -- limited to the issues

19   of his job -- his responsibilities, his job, what he did at his

20   job, and what his responsibilities were.  And, and how he

21   gained his information which he claims was the basis of being

22   an original source.

23           And, I can see allowing discovery in those two areas,

24   and then having a motion for partial summary judgment on those

25   issues.  Because if you're -- I don't need to go into whether

1    he was right or wrong.  I mean, whether they were defrauding

2    with particularity or so forth, I don't need any of that now.

3    I need to figure out:  Does he stand in the position, can he

4    stand in the position of a relator, as that is defined in qui

5    tam actions.

6            And I think what I want to do is allow the parties to

7    conduct -- allow the parties to conduct discovery.  I don't

8    know whether the best thing is to have you amend your complaint

9    or not.

10           **MR. BALESTRIERE:**  Maybe we could wait until after --

11   certainly 12(b)(1), the law -- Your Honor can do exactly what

12   you are suggesting.  We could have -- because it's subject

13   matter jurisdiction, we have to show by a preponderance of the

14   evidence.

15           While generally it's documentary, and there's law

16   that says we can have more, we can have a hearing or something

17   like that.  So, certainly, it's permissible.  And we could work

18   it out with the Defendants.

19           And as Your Honor is saying, then we could decide

20   whether or not we need to address 12(b)(6), (9)(b) issues.

21           **THE COURT:**  Probably that is a good way of doing

22   that.

23           **MR. BLAVIN:**  Your Honor, just to address that point,

24   as Counsel notes, this is an evidentiary motion.  The burden

25   has shifted to them to come forward with a preponderance of the

 1  evidence, to demonstrate that the relator, in fact, is an

 2  original source.  They had nearly six weeks to do so.

 3          **THE COURT:**  Well, I'm going to allow them more time.

 4  Okay, be that as it may.

 5          **MR. BLAVIN:**  All right.  And Your Honor, frankly,

 6  discovery is not going to reveal much of anything.

 7          **THE COURT:**  Well who knows?  Who knows?  Who knows?

 8  Discovery is wonderful.  I don't do it; it's wonderful.  Okay.

 9          **MR. BLAVIN:**  Well, with respect to the specific

10  sources that the relator identifies in the complaint as to

11  whether or not he has direct knowledge from them, based upon

12  the documents, themselves, that are in front of the Court right

13  now, it is facially clear that the relator --

14          **THE COURT:**  I think the way to proceed is I'm going

15  to allow you to amend your complaint.  You amend your

16  complaint, then I'll allow discovery on -- on those issues that

17  I've identified, and only those issues that I've identified.

18  And then, we will see whether or not you believe that you have

19  enough to make a motion.

20          Yes.

21          **MR. AXEL:**  Yes, Your Honor.  Douglas Axel on behalf

22  of AT&T.  And, the Court has been addressing, of course, the

23  public disclosure bar, which is jurisdictional.  And I

24  understand that as far as the Court's view as to discovery as

25  to AT&T and Qwest, we made a separate filing just to point out

1  that under 9(b), which I think all the Defendants have an

2  argument, he doesn't allege anything at all with respect to our

3  client.

4         And so, before we go down the road into discovery, I

5  would certainly urge the Court to grant the dismissal also on

6  the alternative grounds.  Both the 12(b)(6), there's no claim

7  alleged.  And under 9(b), he doesn't allege at all what our

8  Defendant has done.

9         And if he meets those burdens, then, then they

10 confront the discovery on the public disclosure model.

11         **THE COURT:**  So they want to be included out.

12         **MR. BALESTRIERE:**  Yeah.  I do not want them included

13 out, but we can -- and here's why.  To the extent that there

14 are concerns, we can address those.  That, we can address very

15 easily in a repleading, and with more reference to documents.

16         **THE COURT:**  Granting the motion with leave to amend.

17 There you go.

18         **MR. BLAVIN:**  Your Honor, if I could quickly address

19 one point with respect to the leave-to-amend issue.

20         The Ninth Circuit has made clear in the *Marongo*

21 decision that leave to amend is improper on a jurisdictional

22 motion, where the defect is one of substance.

23         And in that case, the Court noted (As read):

24         "If jurisdiction is lacking at the outset,

25         the district court has no power to do

1          anything with the case except..."

2          THE COURT:  Okay.  I'm granting the motion with leave

3  to amend.  If I'm wrong, you can submit -- Seventh and Mission.

4  That's where your recourse is.

5          But I think that it's appropriate in this case to

6  allow the Plaintiff leave to amend, put everything in that he

7  believes identifies his duties, and why this wasn't within his

8  duties, and why it was not publicly-released information or

9  public disclosure.  And then I'll entertain the motion.

10          MR. BALESTRIERE:  Thank Your Honor.  Should I --

11  should we -- do you want to assign four weeks for us to get

12  that in?  Or should I just work it out --

13          THE COURT:  Work it out with the Defendants.

14          MR. BALESTRIERE:  Okay.

15          THE COURT:  And finally, why the -- why our fine

16  friends here should be included in the complaint.

17          MR. BALESTRIERE:  Yes, Your Honor.

18          THE COURT:  Who are you?

19          MR. AXEL:  AT&T, Your Honor.

20          THE COURT:  AT&T.

21          MR. AXEL:  And I believe --

22          THE COURT:  And Qwest?

23          MR. TAYLOR:  And Qwest, Your Honor.

24          THE COURT:  And Qwest.

25          MR. BARNIDGE:  And Sprint, Your Honor.  The specific

1  allegations made to Sprint don't go to a state claim, in any

2  event.  So, I think we're all in a similar situation.

3           **THE COURT:**  One more shot.

4           **MR. BALESTRIERE:**  I understand my obligation with

5  regard to those Defendants, Your Honor.

6           **THE COURT:**  Okay.

7           **MR. AXEL:**  And so, is the Court contemplating

8  there'll be an amendment?

9           **THE COURT:**  Yes.  There will be an amendment, and

10 then there'll be discovery.  And then I'll see you all back

11 here.

12          **MR. AXEL:**  Your Honor, will we be able to bring a

13 motion?  I mean, if he's not meeting his allegation burdens

14 under 9(b) --

15          **THE COURT:**  You'll be able to bring any motion you

16 want to bring.

17          **MR. AXEL:**  Prior to discovery.

18          **THE COURT:**  No, no, no.  Let's get it -- I don't want

19 to piecemeal this anymore.  I want to give everybody one more

20 shot.

21          **MR. BLAVIN:**  And discovery, Your Honor, is limited to

22 the jurisdictional issue?

23          **THE COURT:**  That's right.  A few more hours.

24          **MR. AXEL:**  Very well, Your Honor.

25          **THE COURT:**  Put it on the bill.  Thank you,

1    everybody.

2            **MR. BALESTRIERE:**  Thank you, Your Honor.

3            **MR. BLAVIN:**  Thank you, Your Honor.

4            **THE COURT:**  (Inaudible)

5            **MR. BALESTRIERE:**  Thank you.

6            (Conclusion of Proceedings)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in No. C 09-2457 CRB, United States of America ex rel. John C. Prather, et al. v. AT&T, et al., were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.


_____/s/  Belle Ball_____

Belle Ball, CSR 8785, RMR, CRR

Tuesday, May 1, 2012