1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3    BEFORE THE HONORABLE CHARLES R. BREYER, JUDGE

4    ------------------------------)
                                   )
5    JOHN C. PRATHER,              )
                                   )
6                      Plaintiff,  )
                                   )
7         v.                       )    No. C 09-2457 CRB
                                   )
8    AT&T, INC., et al.,           )
                                   )
9                     Defendants.  )  San Francisco, California
                                   )  Friday, September 13, 2013
10   ------------------------------)     (30 pages)

11

12              TRANSCRIPT OF PROCEEDINGS

13

APPEARANCES:

14

15   For Plaintiffs:        Balestriere, Fariello & Abrams, LLP
                            225 Broadway
16                          Suite 2900
                            New York, New York 10007
17                    BY:   JOHN GERARD BALIESTRIERE
                            DAVID J. MICLEAN
18
     For Defendant:         Sidley, Austin, LLP
19   (AT&T)                 555 West Fifth Street
                            Suite 4000
20                          Los Angeles, California 90013
                      BY:   ANAND SINGH
21                          DOUGLAS AXEL

22   For Defendant:         Munger, Tolles & Olson, LLP
     (Cellco/Verizon)       560 Mission Street
23                          27th Floor
                            San Francisco, California 94105
24                    BY:   JONATHAN H. BLAVIN

25

**APPEARANCES** (cont.):

| | |
|---|---|
| **For Defendants:** | **Perkins, Coie, LLP** |
| **(Qwest, Sprint)** | **1201 Third Avenue** |
| | **Suite 4800** |
| | **Seattle, Washington 98101** |
| | BY:  **DAVID FRANCIS TAYLOR** |

| | |
|---|---|
| **For Defendant:** | **Williams & Connolly, LLP** |
| **(Sprint Nextel)** | **725 Twelfth Street, N.W.** |
| | **Washington, DC 20005** |
| | BY:  **EDWARD C. BARNIDGE** |

Thursday, September 5, 2013

                                                    (10:28 a.m.)

       (In open court)

          **DEPUTY CLERK:**  Calling Case C 09-2457, John Prather

vs. AT&T.

       Appearances, Counsel.

          **MR. BLAVIN:**  Jonathan Blavin for defendant Cellco

Partnership, d/b/a Verizon Wireless.

          **MR. BARNIDGE:**  Edward Barnidge for defendant Sprint

Nextel.

          **MR. SINGH:**  Arand Singh on behalf of AT&T.

          **MR. AXEL:**  Douglas Axel, also for AT&T.

          **MR. TAYLOR:**  David Taylor for defendants Qwest and

Sprint.

          **MR. BALESTRIERE:**  John Balestriere, along with my

cocounsel David Miclean, here for John Christopher Prather,

who is in the courtroom and available if needed.

          **THE COURT:**  So this case is in front of me now since

the interesting and perhaps somewhat difficult question as to

whether or not the relator is entitled to be compensated as a

qui tam action -- right?  Does he meet that qualification?

          **MR. BALESTRIERE:**  Is he an original source, yes, your

Honor.

          **THE COURT:**  So we're all on the same page.  And -- in

part.  And what I'd like to hear some discussion about this

morning is whether –– one question I have is whether he loses

his original source status by virtue of the fact that his

supervisor –– is it the Attorney General's Office, State

Attorney General's Office?

**MR. BALESTRIERE:** Yes, your Honor. I think the job

that he had the most that's been before the Court is the

Organized Crime Task Force, where the supervisor essentially

was the Attorney General.

**THE COURT:** Okay. Whether he was, as part of his

duties, required to submit an affidavit in which a member of

the –– in which some of the information upon which he bases

his claim as being the original source was disclosed, at least

in some form –– obviously not the form that it ultimately was

litigated, I guess. And that's the question. And he says, as

I understand, or you say in your papers, no, really, this

wasn't his task. And therefore the fact that he did submit

this document in response to a request doesn't disqualify him.

And maybe you want to say it better than I've just said it.

There we are. If you do, go right ahead.

**MR. BALESTRIERE:** No, you're right, your Honor. We

cited to the New York Executive Law 70 A1 –– it's in our

papers –– which did lay out what his duties were, and they

were to conduct multi county or multi state organized crime

investigations. He ended up first making his disclosure to

the government, actually, in 1999, when he spoke to people at

OCTF, the Organized Crime Task Force.  He also, between that

time and 2004, which is what your Honor's talking about, the

submissions to the FCC, he made disclosures to the Attorney

General himself at the Attorney General's office, and even to

the Chief of Investigations at New York County District

Attorney's office, so even before 2004, before there was any

FCC inquiry, he had been developing over years his direct

knowledge of this overcharging for intercept provisioning.

Then, in 2004, the FCC wants to discuss the statute -- not

the statute in question but one of the relevant statutes,

CALEA.  It had been around by that point for nine years.  They

want to discuss a wide range of things.  The part of it that

the defendants have focused on is that in their call for

submissions, they want to discuss cost methodology and

financial responsibility.  And Mr. Prather ended up testifying

that by financial responsibility, he thinks -- though this is

his facts -- he thinks that the FBI -- he wanted to float the

idea of maybe charging a little bit to individual consumers to

pay for some of these costs.  But that's what he said.  Cost

methodology and financial responsibility.

Placed in context of the fact that Mr. Prather had been

for five years trying to get attention to this issue, he went

to the people that would be making submissions.  Said, I want

to put in something about these overcharges.  And frankly, the

deposition's quite long, there's a lot of papers here, your

Honor, but it came out in all that that they didn't really want him to do that at first, that they were going to be talking about all -- the range of issues, this is something they didn't want to talk about.

So to the voluntariness issue, he kind of went out of his way -- not kind of, he did go out of his way to make this submission.

As to whether or not he was aware of any other submissions made by other sheriffs' offices, if your Honor will recall that's something the defendants point to is that a few others complained of the same thing. Mr. Prather testified under oath -- no basis not to believe this -- that he didn't even know of those until 2012. It's not like he got a copy of everything that was submitted by anyone else.

And if your Honor were to contrast, I would say, those submissions with Mr. Prather's affidavit, his is a detailed, eight-page affidavit. He talks about specific companies. He talks about what he believed the prices should have been. And the sheriffs, there seem to be a common letter, I'm unaware of this, but apparently there was some kind of sharing of information, but he didn't see them.

So he made his disclosure for five years. But even with regard to the FCC, he made it independently, he made it based not on reviewing any other government disclosures, but with regard to knowledge that he had developed over years

unmediated by anything other than his own labor to use the
*Wang* decision, 1992 Court of Appeals.

And so he qualifies with all of the original source
requirements. And the fact that he's a government lawyer,
something that the defendants made much hay of, that's a
settled issue in this circuit and in other circuits under the
*Fine* and the *Hagood* decisions here.

Under the *Williams* case in the Eleventh Circuit, you can
be not just a government employee, but a government lawyer,
and you can still be deemed a relator. The times when
somebody's been found not to be a voluntary relator has been
essentially where it was going to happen anyway because of
government conduct. There's a -- if your Honor recalls the
*Barth* decision, where there was a Housing and Urban
Development investigator, kind of hunts down this guy, got
testimony from him, and then they turned around and become a
relator.

Or the *Fine* and the *Biddle* decisions, Ninth Circuit, where
in *Fine*, the lawyer who wanted to be a relator, he was an
auditor in the office of Inspector General. And there's no --
his job was to deal with this. I mean, the statutes say your
job is to prevent this exact kind of fraud. And in *Biddle*, it
was the Navy lawyer who worked on a transaction in question.
Both *Biddle* and *Fine*, unlike Mr. Prather, could have stopped
the misconduct.

1        Mr. Prather for 14 years, in my opinion, has done all he

2   can to point attention to this.  He couldn't indict these

3   defendants.  That wasn't his charge.  He didn't work in the

4   False Claims Division, if there was one at the Attorney

5   General's office at that time.  He disclosed it to everyone he

6   could, based on his personal knowledge, and I think meets he

7   the original source requirement of voluntary.  But even after

8   taking some of their argument, a government lawyer under these

9   circumstances can voluntarily disclose, as Mr. Prather did.

10       **THE COURT:**  Let me stop you there.  For your argument

11  to succeed as a voluntary disclosure, are you then pointing to

12  the events that took place prior to the time that he furnished

13  a written, whatever it was, affidavit?

14       **MR. BALESTRIERE:**  Affidavit to the FCC.

15       **THE COURT:**  Is it -- are you pointing to that as

16  being significant in terms of the voluntariness of his

17  disclosures?

18       **MR. BALESTRIERE:**  Yes, but only part of it.

19  Definitely only part of it.

20       **THE COURT:**  So let's take that out for a minute.

21  Let's just take it out.  Let's say the only thing that

22  happened here was, of course, he had all of his suspicions by

23  virtue of the fact of his employment.  His experiences, you

24  know, with law enforcement.  He saw what costs were before, or

25  what the fees -- what the charges were before, what the

charges were afterwards, and he said, This is very fishy;

these charges are too high.  And then he thought to himself,

And also, the statute that Congress enacted doesn't permit

them to pass on certain costs.  And clearly, because I'm, you

know, I'm not terminally impeded by common sense, it appears

to me that they must be charging for these costs, which would

be impermissible.  So he comes to all of these conclusions

himself.  Okay.  And his superior or somebody there says, you

know, write -- put that in the affidavit.  We're having a

hearing and I want that information in the affidavit.

Let's just assume those facts only for a moment.

**MR. BALESTRIERE:**  Can I ask that we don't assume the

last one, because it's not true.  Meaning his supervisor

didn't come and say, Let's get this in the affidavit.

**THE COURT:**  What is true?

**MR. BALESTRIERE:**  So let's take it up before 19 --

excuse me, 2004.

**THE COURT:**  Take it out.

**MR. BALESTRIERE:**  For the purpose of this discussion.

Though I think it's very relevant in general.  There was a

call not just to attorneys general, but really to privacy

groups, to telecommunications carriers.  Just, Let's discuss

CALEA.  Let's discuss a lot about it.  No one says, Let's

discuss high charges for intercept provision.  No one says, We

think there's fraud here.  Certainly no one says, We think

1    there's 10 times the charges, which is what Mr. Prather

2    believes that it is, based on his years of experience.  He is

3    not the one that is supposed to even respond to that.  The

4    Attorney General's office is not that big of a place.  He's

5    someone senior.  He's aware of this is going on.  He goes out

6    of his way to see, is there someone we can see about this.

7         **THE COURT:**  So he goes down the hall to the person

8    conducting the litigation, says, You know, you're conducting

9    this litigation, I think something wrong has gone on here.

10   And let me tell you what I think has happened.  I think

11   they're passing on their costs of implementation.  And, you

12   know, the statute says they can't do that.  That's what I

13   think is happening here.

14       And the person says, Well, you know this hearing isn't

15   about that.  And he says, Well, you know, this is what I think

16   is going on here.  Says, Well, okay, maybe we should include

17   it; maybe we should look into it.

18       That's your -- that's a partial -- that's your version of

19   some of the facts.

20       **MR. BALESTRIERE:**  There wasn't a litigation, so it's

21   not like a specific lawyer --

22       **THE COURT:**  Wasn't there a hearing or something?

23       **MR. BALESTRIERE:**  I think eventually there were

24   hearings that the FCC conducted.

25       **THE COURT:**  Or, You should look into it.  Prompted

1    him to look into it.  Let's just take that.  Is that enough?

2         **MR. BALESTRIERE:**  It's still voluntary.  And there --

3    I'd ask your Honor to look at two decisions they rely on

4    somewhat heavily:  *Paranich*, Third Circuit, 2005, and the

5    *Barth* decision, Eighth Circuit 1995.  Where in *Paranich* there

6    was a subpoena and the Court said, all indications suggest

7    that the relator would not have come forth otherwise.  That

8    but for government action of kind of getting this guy, there

9    would not have been a disclosure.

10        And there's something very similar in *Barth*, which I

11   referenced earlier, where a HUD investigator sought out Barth

12   and said:  You -- I want you to tell me certain things.

13        No one came to Chris Prather individually.  No one was

14   even specifically asking about the high charges for intercept

15   provisioning.  So even if you accept their view that the

16   burden's on us to show, by a preponderance of the evidence --

17   I think your Honor's review of the letters, as well as what

18   Mr. Prather has said, shows that it was voluntary.  This was

19   not part of his job.  And there again, I would contrast it

20   with *Biddle* and *Fine*, which we discussed earlier, where that

21   was their job.  That was exactly what those guys were supposed

22   to do.  So we don't want someone like that being a relator.

23        Whereas here we do have a -- five years of history, which

24   I understand, for the purposes of this conversation, we're

25   setting aside, and I think -- but I think it is relevant, your

Honor, because it's not like in *Paranich* where, Okay, well, we subpoenaed the guy, we were going to get this information anyway, he had been disclosing it for five years, and then finally saw, okay, here's a chance to get in front of the Feds.

And again, it's a long dep, your Honor, but he explained the reasons why there was some reluctance on his part. He had to work with these telecoms. He did not want to tick them off. I think he uses an example and said, They can give you a subpoena response in a day, or they can take two weeks. So he was going through every route he could to make the disclosure. I mean, from a policy perspective, which I think is what original source looks at. Don't we want someone like this who's working hard to make the disclosure, to have the incentive, to continue to come forward here? As opposed to, I don't want a guy like Fine, who actually made --

**THE COURT:** Well, I think from a policy point of view, yes, of course, you want people to come forward. But if it's their job to come forward, then we draw a line. Because we say, Are we going to give an added incentive for people just doing their job? Otherwise -- because that's not what the statute is designed --

**MR. BALESTRIERE:** I agree.

**THE COURT:** The statute is to take a look at people who aren't -- whose job it isn't to come forward, and to get

1   them to come forward.

2            **MR. BALESTRIERE:**  I agree.

3        **THE COURT:**  That's it.  It's not any more complicated

4   than that, from my point of view.

5            **MR. BALESTRIERE:**  With regard to voluntariness, I

6   agree.  And that's why I'm saying someone like Fine, who I

7   think actually filed multiple false claims based on what he

8   learned as an auditor, we don't want that person, that our tax

9   money goes to, to conduct investigations as an auditor in an

10  office of Inspector General to be a relator.  Or the same

11  thing in *Biddle*.  Biddle, he was responsible, the lawyer

12  there, your Honor, for the transaction.  He could have stopped

13  the fraud.  Whereas this was not part of Mr. Prather's job.

14  And -- I mean, he is here, if your Honor wants to ask him any

15  questions.

16           **THE COURT:**  No, I don't think that's appropriate.

17     Go ahead.

18           **MR. BLAVIN:**  I think it is appropriate to break up

19  the different disclosures which were purportedly at issue

20  here.  We have the FCC affidavits, and we have the other

21  allegations that he said certain things to various employees

22  within New York State.  The law is very clear that the FCC

23  affidavits are the only ones which are relevant for purposes

24  of the Federal False Claims Act.  Disclosures to state

25  employees do not satisfy the voluntary requirement.  That was

1   the Jones case from the Sixth Circuit.  So in terms of looking

2   at the various submissions, I think it does make sense to

3   first focus on the FCC affidavits, and then we can discuss

4   later the various conversations he had with the New York State

5   Attorney General or any other employees.

6       Now, with respect to the FCC affidavits, the record is

7   indisputably clear here that he prepared these at the explicit

8   direction of the head of the telecoms bureau at the New York

9   Office of the Attorney General.  He initially did come

10  forward, said, I want to do this; can I do this.  They said,

11  No, you can't do this.  It was only when Miss Werling, the

12  head of the telecom bureau, explicitly said to him, Please do

13  this that he did it.  The testimony on this --

14          **THE COURT:**  So let me just stop you there.  So you're

15  saying that what he should have done at that point, if he

16  wanted to qualify as a relator, he should have quit and leave

17  the office and then reported to whomever he would report to,

18  publicly or otherwise, about what he had seen?  And if he had

19  done that, he then arguably would have been a relator?

20          **MR. BLAVIN:**  Well, the question, your Honor,

21  raises -- directly goes to why it's so difficult for

22  government employees to be relators.

23          **THE COURT:**  But you haven't answered the question.

24          **MR. BLAVIN:**  To qualify as an original source in that

25  circumstance, to make sure that his submission was not part of

his job responsibilities at the time, that may have been an option for him. But if you look at the record here with respect to these specific affidavits, the testimony is clear. He said in his deposition that Miss Swerling said, I think —— I think maybe we would put in an affidavit about overcharging. Can you do that affidavit for us? He did that affidavit as part of his official responsibilities and as a deputy attorney general. He submitted them in support of the New York Attorney General's submission to the FCC. He did it during work hours in exchange for a salary, with the assistance of other employees at the New York Attorney General's office.

If you look at the Ninth Circuit law on this, it's clear that it falls within the scope of the *Biddle* case, which cited that only some aspect of the job responsibilities have to involve the disclosure of fraud. It falls within the *Fine* case, which said it just has to be, quote, an employment-related obligation in exchange for a salary.

He testified at his deposition that this was part of his job. He said that going and complaining about charges he thought fell within his responsibilities. In his affidavits submitted to the FCC, he said that the OCTF, where he worked, regularly complained about charges to the carriers. This clearly falls within the scope of his job responsibilities, within the Ninth Circuit law on this, and those submissions to the FCC were an employed-related obligation, and they do not

1    constitute a voluntary submission to the FCC.  They were part

2    of his job.  In fact, in the *Biddle* case itself it noted -- it

3    discussed, Well, you know, there's the governing regulations

4    as to what one's job responsibilities may be.  It noted that,

5    quote, Biddle supervisors may direct him to perform certain

6    specific tasks.  Clearly that would fall within an employment

7    related obligation.

8        That's exactly what happened here with respect to the FCC

9    affidavit.  Miss Swerling asked him, Can you do this.  He did

10   it as part of his job in support of an official submission by

11   the New York Attorney General's office to the FCC.  This is

12   not like the Hagood case at all, where it's clear no one had

13   requested -- none of the supervisors or superiors had

14   requested that the employees submit that information to the

15   government.  Here it's -- you know, the record speaks for

16   itself.  He was told to do this as part of his job.  He did it

17   as part of his job.  He was paid to do it.

18        **MR. BALESTRIERE:**  May I respond regarding *Biddle* and

19   *Fine*, your Honor?

20            **THE COURT:**  Sure.

21        **MR. BALESTRIERE:**  Because we're -- with respect, I

22   think Mr. Blavin is wrong, and obviously your Honor can read

23   the decisions, but in *Biddle*, the lawyer there had to abide

24   by -- and it's in our papers -- federal acquisition

25   regulations -- it's 48 CFR Section 1.602 -- which said that he

was responsible for safeguarding the interest of the United States in his contractual relationships.  So *Biddle* is this contract lawyer working on a deal where the United States is a party to it.  His -- the specific statute that applies to him, contrasted with the New York executive law, says, you, Biddle, are responsible for safeguarding the interests of the United States.  So the specific law that applies to him obligated him, no conversations with supervisors needed, to do what he did, and I'll talk about the conversations in an a second.

With regards to *Fine*, the Court said that Fine's paramount responsibility was his duty to disclose fraud to his supervisors.  It was required by the very terms of his employment, as opposed to here.  And, as Mr. Blavin said in the very beginning of what he said, Mr. Prather went to Miss Werling, who eventually worked at Verizon at some point, that he wanted to make the submission, and they said no.  I think this goes to show how -- he convinced them to say, Can I include this?

**THE COURT:**  Let me ask Mr. Blavin a question.  So let's say you have a worker, works for the government, as a secretary in a U.S. Attorney's office.  And he sees some -- he's not a line lawyer -- maybe a lawyer or not.  Doesn't have to be a secretary.  Lawyer.  Works in Department X.  And he sees something that is improper, a violation of -- what appears to him to be a clear violation of the contract.  He

goes to someone there.  He says, You know, I see this going

on, and, you know, I saw this, I saw this thing, because I saw

them -- whatever it was, so on so forth -- this is fraud.

Fraud is being committed against the government.  And so the

person says, Hey, write a report.  You know, set it all out.

Tell us what you saw, why you say you think it's a fraud.  And

that person says, I don't want to get involved.  You know,

that's not my job.  I don't want to get involved.  I'm not

writing any report.

    Fired?  Do we fire that person?  Because the job requires

compliance -- you know, a supervisor saying or somebody

saying, You see something in which your employer is being

defrauded, please write it out, and you say, No -- can I fire

that person?  Can I terminate that person?  Can I take any

disciplinary action against that person?  Can I force that

person as a, quote, condition of the job:  You want to stay

here, you write that report?  I don't want to write that

report.

    What about all that?  Is that -- putting it another way,

you say it's part of the person's job.  Is it really?

        **MR. BALESTRIERE:**  No.

        **MR. BLAVIN:**  Well --

        **THE COURT:**  You say, Yes, it is.  And I guess if you

say, Yes, it is, and the person doesn't do it, they're out of

here.  They can be.  They're fired.

1    So in other words, if Mr. Prather didn't write that

2    document or wasn't willing to cooperate and wasn't willing to

3    furnish that information, in your view, he could have been

4    terminated, because it was part of his job to do so.  Is that

5    the argument?  Or have I missed it.

6         **MR. BLAVIN:**  That's not the argument your Honor.  The

7    argument is, you have to look at the specific submissions made

8    to the government and determine whether or not they fell

9    within the scope of his job responsibility.  That's what the

10   governing law says.  Here, it's clear that they did fall

11   within the scope of his job responsibilities.  This is not an

12   independent submission.

13        **THE COURT:**  So the circumstances don't make a

14   difference.  The circumstances being whatever was occurring

15   around it, you look at what he did and was that part of his

16   job.  And you say, what he did was submit this document or

17   documents, was that part of his job?  Yes.  And that's the end

18   of the inquiry.  Is that right?

19        **MR. BLAVIN:**  The Ninth Circuit says it just has to be

20   some aspect of his job responsibilities.  That's the language

21   from the Biddle decision.

22        **THE COURT:**  And if he didn't do it, he could be

23   fired?

24        **MR. BALESTRIERE:**  As saying before, do we want

25   someone to quit and file a false claim?  I don't think *Biddle*

1    and *Fine* could have anyway, because they came to their

2    information in the course of their duties.  It was their job

3    to ferret this out.  But you're right to bring up, is this --

4            **THE COURT:**  That's not his job.

5            **MR. BALESTRIERE:**  No, it's not.

6            **THE COURT:**  You're not arguing, are you, that this

7    was -- that he came into this information -- or maybe you

8    are --

9            **MR. BALESTRIERE:**  They did at one time.

10           **MR. BLAVIN:**  I'm sorry, what's the question?

11           **THE COURT:**  Good point.  What's the question.  That

12    it was -- that he came into this information by virtue of his

13    job obligations.  The costs, the overcharges.

14           **MR. BLAVIN:**  He alleges that he reviewed various

15    documents.  He initially said that he reviewed hundreds of

16    invoices in his complaint, which was subsequently revised to

17    two to five, and this goes to the direct and independent

18    knowledge, your Honor, which is an independent prong of the

19    original source requirement, and I don't want to lose that

20    because I think the record is very clear that he does not

21    satisfy that.

22        So I know we've been talking about voluntariness, but he

23    also needs to establish that he had direct and independent

24    knowledge.  He reviewed a handful of invoices.  He doesn't

25    remember who they were from, whether or not they involved any

of the defendants. He doesn't know even what rates were at issue. He says he looked at the OCTF budget. All of these are pricing related documents. There's no evidence of any direct and independent knowledge of any fraud. He received all of this information secondhand from other employees in his office. None of it was directed. Unmediated. Anything else -- the law is very clear, you're receive something from a co-employee, that's not direct and independent knowledge. All he did was he looked at these documents over the shoulders of others, as he testified, from other people, talking to people who were responsible for the budget, and he said, Oh, these prices seem high to me. Based upon my background and expertise and the years that I've worked, that looks like fraud.

That does not satisfy the direct and independent knowledge requirement of the False Claims Act. The -- in *A-1 Ambulance*, the Ninth Circuit was very clear that just using your background or expertise to take information that was in the public domain does not constitute direct and independent knowledge. He testified at his deposition that he was absolutely not uniquely qualified to bring the suit, that many other prosecutors across the country would have known these charges, they would have seen that evidence, and he just said, but based upon my expertise, I know that this isn't costing what it should have cost. At the last hearing, your Honor,

you explicitly said -- I'm sorry.

        **THE COURT:**  Show some mercy.

        **MR. BLAVIN:**  I appreciate that, your Honor.

You explicitly said that just looking at documents and saying this doesn't cost what I think it should cost is not, in my mind, direct and independent knowledge of fraud.

And that's exactly what the evidence here is.  And the Ninth Circuit and your Honor confirmed that that does not constitute direct and independent knowledge of fraud. Moreover, it was entirely secondary, received from other employees at the office, from purported conversations with the employees.

In the *Devlin* case, the Ninth Circuit explicitly said, you talked to the defendant's employees, you have interviews or letters from them.  That's not direct and independent knowledge.  You have to gain that knowledge yourself, with your own eyes.  But moreover, all of this is entirely vague and speculative.

In his amended complaint, which your Honor instructed him to put everything in, that, you know, that establishes that you're an original source, claimed:  I reviewed hundreds of invoices.  He said that to various government agencies at the time that he was trying to get them to join this lawsuit.  At his deposition he said, No, two to five, maybe.  Those allegations in the amended complaint aren't right.  Those

letters that I sent to other attorney generals' offices trying to get them to join this False Claims Act, no, I didn't review hundreds. Two to five, maybe.

With respect to those two to five invoices he reviewed, doesn't know anything about them.

MR. BALESTRIERE: May I --

MR. BLAVIN: There's other allegations I'd like to respond to as well. He says that he has knowledge of the OCTF equipment. How does that establish any direct and independent knowledge of fraud, of what the defendant's internal expenses are? That's what the relevant statute says. He says he has no idea what the defendant's internal costs are. He says, I have no idea what technologies they use. This is in all his deposition. The fact that he knows what equipment the OCTF uses, it's entirely irrelevant to whether or not he can actually establish some sort of fraud in this case.

MR. BALESTRIERE: Your Honor, may I?

THE COURT: Sure.

MR. BALESTRIERE: Okay. With regards to voluntariness, which we've seem to have somehow moved on from, look at *Fine*, please. Look at those decisions. I think we're dealing with voluntary.

With regards to direct, I heard a lot of tone over here, but if your Honor were to look at the deposition testimony, Mr. Prather corrected himself with regards to the number of

the invoices.  He volunteered it very early in the deposition testimony.  They actually refused to go along with him putting in an amended pleading on that point when he wanted to correct it, but he didn't say a few or two invoices, or I saw 200 and that's how I knew.  He said, and has consistently said over the course of decades, you -- look at the *Wang* decision, 1992 Court of Appeals, two weeks when someone obtained enough information.  The *Devlin* case does say, with your own eyes, you review.  He says he had seen the OCTF budget, which first put him on notice when he thought, as it said in the deposition, $400, that just sounds like a lot when to his knowledge, wires cost about $200, and then he saw at that point they were going for around 2,000.

      With regards to him not going the details, as he freely admitted at his deposition of the internal cost structure of the defendants, not only do only they know that, which almost helps us when the fact is that he did know and could say that after CALEA was passed, it was literally flicking a switch, and Mr. Prather went into pages of deposition testimony where he talked about how it was done before, because he was aware of it, where someone would have to go to a telephone pole, climb up, put on a device called a slave, go back down into the car, and drive back to the, at the time, your telephone or whomever's headquarters.

              **THE REPORTER:**  Can you slow down, please?

1      **MR. BALESTRIERE:** Whereas after CALEA, after our

2   government paid half a billion dollars to these defendants to

3   help them upgrade their systems, it should just take the flick

4   of a switch. So he doesn't need to know how much did that

5   flick of a switch cost. Two cents, $2. I don't know. Has a

6   good faith basis to say -- or we're more arguing under the OCC

7   SSA, under the CFR provisions we cite in the complaint and in

8   our papers: How is the reasonable expense of that result in

9   you increasing by 10 times what you charged? He goes into

10  detail how he knew this. He talks about how he did see some

11  invoices, how he did speak to other people in the office, but

12  over a period of time. He is not getting this secondhand. He

13  doesn't need to be uniquely qualified, as Mr. Blavin says.

14  There's no false claim statute, nor the federal one, that

15  requires you to be the only person that would have been --

16  could have been the whistleblower here. Sure, in 2004, maybe

17  before, someone else could have disclosed. But it was

18  Mr. Prather who did.

19      We are saying that he is somewhat unique in terms of his

20  term of service. That he saw all these prices before. And

21  someone new at the U.S. Attorney's office now doesn't see it,

22  but it's not entirely secondary. We have to show, even if you

23  accept our argument, that this is still a jurisdictional

24  question which -- even if you accept the defendant's argument,

25  that we have a burden of proving by a preponderance -- I think

actually they do, under the 2010 amendments -- but either way,

we show, at least by a preponderance of the evidence, based on

the testimony of the -- the only person's testimony we really

have here, Mr. Prather, that he worked there for years, that

he saw all these things, that he came into this knowledge from

various jobs, that it was unmediated by his own labor.  Though

I would point out the *Cooper* decision your Honor, Eleventh

Circuit 1994, and the *Dodge* decision, Middle District of

Florida 2009, where those courts said, If you conduct a due

inquiry, well, good for you.  I mean, we don't want you

rushing off and complaining about misconduct if there's really

no basis for it.  Mr. Prather didn't need to actually conduct

a further investigation, given his many years and knowledge.

**THE COURT:**  Let me give you the opportunity to

respond.  Okay?

**MR. BLAVIN:**  Thank you, your Honor.  Now, with

respect to the fact that the costs went up, that was

observable by anyone.  He said any prosecutor in the country

would have known that.  The point of the original source test

is that you do not want to provide a benefit to those who do

nothing for the government.  I mean, at this point, anyone

within the government could have brought this claim that would

have known, Hey, the prices have gone up, as the relator

himself testified.

**THE COURT:**  Do you have to be uniquely situated to

1  bring this?

2  **MR. BALESTRIERE:**  No.

3  **MR. BLAVIN:**  You have to have direct and independent

4  knowledge of fraud.  You have to be a close observer of the

5  fraud.  Just seeing prices have gone up when the relator

6  himself testified that there had been a revolutionary change

7  in the technology at issue doesn't establish any kind of

8  direct and independent knowledge of any fraud.  It's just cost

9  documents.  If you look at the decisions we cite in our

10  papers, your Honor, they repeatedly hold that knowledge of a

11  transaction, knowledge that costs may differ between different

12  entities, does not establish direct and independent knowledge

13  of fraud.  In the *Reagan* case, which is affirmed by the Fifth

14  Circuit, the purported relator there said, Well, I looked at

15  these invoice and I said, Hey, these are higher than what

16  other people are charging.  That seems wrong to me.  The Court

17  said, That's not direct and independent knowledge of any

18  fraud.

19  If you look at the other decisions we cite, the *Aflatooni*

20  case from the Ninth Circuit, the Court said, Well, the fact

21  that you may think that there's certain auditing deficiencies

22  when you look at these transactions, that doesn't satisfy the

23  direct and independent knowledge test.  It's something more.

24  And that's why the courts repeatedly have said -- the

25  Ninth Circuit in the *Wayne* case said, that the paradigm qui

1    tam plaintiff is the whistle-blowing insider.  Because they

2    observe the fraud with their own eyes, unmediated by anything

3    else.  In the *Wayne* case, the person was an employee for the

4    defendant.  Same with the *Barajas* case.

5        And your Honor, just quickly, if I may respond on the

6    voluntary prong, just to the other submissions to the New York

7    State --

8              **THE COURT:**  Right.

9              **MR. BLAVIN:**  -- officials.  Just quickly on that,

10   your Honor.

11       One, as noted, they don't qualify for the Federal False

12   Claims Act.

13       Two, they were entirely vague and speculative.  Nothing

14   substantiating any kind of fraud.  Just more of:  I think

15   these costs are high.  The record shows that.

16       Three, Title IX of the New York Code, its rules and

17   regulations, which we said in our paper, which relator

18   conceded applied to him.  Said, Yeah, I have a duty to report

19   vendor fraud when I see it.  He was looking at these invoices,

20   approving them.  The rule that their saying is, Well, no, he

21   didn't have the duty within his responsibilities to say, I

22   thought that this was overcharging.  He was looking at these

23   invoices himself.  It's part of his job responsibilities.

24       And Title 15 of the New York Code, which relator conceded

25   applies to him, says the very same thing.

1    Also, he was an attorney for the State of New York.  The

2    New York Code of Professional Responsibility said he had a

3    duty to his client to disclose if he thought that the

4    government, the state government, was being defrauded by

5    people who were providing the services to it.  He testified in

6    his deposition he thought that that was part of his job.

7         **THE COURT:**  So that would mean that any attorney

8    working at any entity who is providing legal services to that

9    entity couldn't become a whistleblower.

10        **MR. BALESTRIERE:**  Exactly, and that's not --

11        **THE COURT:**  Doesn't it?  Doesn't it mean that?  If

12   you say, Well, his fiduciary duty -- I don't disagree with

13   you, by the way.  I think there is a fiduciary responsibility;

14   I understand that.  But doesn't that argument prove too much?

15   Doesn't it then exclude -- maybe you're right.  In other

16   words, that's it.  You know, whatever they say.  QED.  That's

17   the end of the -- that's it.  There we are.  And he's an

18   attorney.  He's working there.  He has a fiduciary duty to his

19   client.  This is his client.  End of inquiry.

20        **MR. BLAVIN:**  Well, your Honor, in this circumstance,

21   he was purportedly reviewing invoices for payment.

22        **THE COURT:**  It's heavy attorney.  Attorney plus.  Not

23   attorney light.  Okay.

24        **MR. BLAVIN:**  And you have Title IX, and the fact

25   that --

1     **THE COURT:**  I have got the arguments.  Thank you very

2   much.

3       Nope, you've all had a enough time, and I'm going to take

4   a five-minute recess, and then we'll call Antonick.

5     **MR. BALESTRIERE:**  Thank you, your Honor.

6     **MR. BLAVIN:**  Thank you, your Honor.

7       (Adjourned)

8                              oOo

9

10

11

12

13

14

15

16                    CERTIFICATE OF REPORTER

17

           I, Connie Kuhl, Official Reporter for the United
18   States Court, Northern District of California, hereby certify
     that the foregoing proceedings were reported by me, a
19   certified shorthand reporter, and were thereafter transcribed
     under my direction into written form.
20
                    _Connie Kuhl_
21   _____

22               Connie Kuhl, RMR, CRR
              Wednesday September 18, 2013
23

24

25